MaddeN, Judge,
delivered the opinion of the court:.
The plaintiff, in June 1946, acquired all the rights and assumed all the liabilities of Ware Shoals Manufacturing Company and stands in the position, so far as the instant case is concerned, that Ware Shoals would have been in if the transfer had not occurred. In this opinion the word “plaintiff” will apply to both corporations. The figures used in this opinion are not the true figures involved in the case. They have been simplified and rounded in an attempt to make the computations more understandable. The exact figures involved are given in our findings of fact.
The plaintiff performed war contracts for the Government in the year 1944. In April 1945, it filed its excess profits tax return showing a surtax net income of $3,000,000 and an excess profits tax of $2,000,000. It paid this tax of $2,000,000 during 1945, except for $200,000, which was forgiven by the Tax Adjustment Act of 1945, enacted July 31,1945, 59 Stat. 517, section 3(h) of which added section 784(a) to the Internal Revenue Code of 1939. Section 784(a) granted a 10 percent credit against their excess profits taxes to taxpayers in the position of the plaintiff.
The Quartermaster General, with whose agency the plaintiff’s 1944 Government contracts had been made, took the position that the plaintiff had made excessive profits on its 1944 Government contracts, and initiated a renegotiation of those contracts. By a renegotiation agreement dated August 24,1945, it was provided that $800,000 of those profits should be eliminated from the contract prices, pursuant to the Renegotiation Act, 50 App. U.S.C. (1952 ed.), § 1191. .
If a war contractor paid taxes upon the income which he actually received, and if he was later, as a result of renegotiation, required to return a part of that income to the Government he was, of course, entitled to ah adjustment of his taxes. One way to have accomplished this result would have *320 been for the plaintiff to pay back the $800,000 to the Quartermaster General, and for the Internal Eevenue authorities to pay back to the plaintiff so much of its 1944 taxes as had been imposed upon the $800,000 which the plaintiff had not been allowed to keep. However, section 3806 of the Internal Eevenue Code of 1939, 26 TT.S.C. (1952 ed.) § 3806, added to the Code in 1942, 56 Stat. 798, 964, and amended in 1944, 58 .Stat. 21, 90, provided that in such cases the amount of the tax paid upon the eliminated profit should be credited to the contractor, and he should have to repay to the Government only the amount by which his excessive profits exceeded the tax which he had paid upon those profits.
When the Quartermaster General had arrived at his renegotiation agreement with the plaintiff, he requested the Bureau of Internal Eevenue to make the necessary computation to show how much of the $800,000 of its excessive profits the plaintiff would have to pay back, after the necessary tax adjustments had been made. The Bureau examined the plaintiff’s 1944 return, saw that it showed a tax of 80% oh excess profits, and advised the Quartermaster General that 80% of the $800,000, or $640,000 would be accounted for by the elimination of the tax on the eliminated portion of the profits. That left $160,000 to be repaid by the plaintiff to the Quartermaster General in cash. That sum was so repaid on November 9,1945.
The computation made by the Bureau of Internal Eevenuer, though it was made late in August 1945, after the enactment on July 31 of section 784(a) giving the plaintiff what was in effect a ten percent reduction of its excess profits tax, neglected to take that reduction into consideration. If it had taken the reduction into consideration, it would have shown that the plaintiff, when it had paid its 1944 taxes, would not have .paid $640,000 of excess profits taxes on the $800,000 taken away from it by renegotiation, but would have paid $64;000 (10% of $640,000) less than that, i.e., $576,000, and that only $576,000 should be credited to the plaintiff against the $800,000 which it was obliged, by the renegotiation agreement, to refund, by credit Or otherwise, to the Government. ' In the transaction, then, the plaintiff, because of being credited with paying $64,000 moré taxes than *321 it actually paid, was $64,000 short in its restoration to the Government of the $800,000 of its excessive profits on its contracts.
As we have said, the figures used above are rounded and simplified. There were, in fact, other items in the plaintiff’s 1944 returns which received further study. By valid consents, the questions were kept open and . a revenue agent made a report in 1952, forwarded to the plaintiff in 1953, which included the $64,000 discussed above, as a deficiency in the plaintiff’s 1944 excess profits tax, and interest on the deficiency. The plaintiff paid the.$64,000 plus interest, filed a claim for refund which was denied, and brought this suit.
The plaintiff does not contest the fact that there was an underpayment by it to the Government, arising out of the computation of its 1944 taxes and its renegotiation agreement, of $64,000. It says, however, that the $64,000 underr payment was not a deficiency in the payment of its taxes, but was only a failure to pay an amount which it had, by its renegotiation agreement, promised to pay and had not paid. The plaintiff says it should not have had to pay either the $64,000 or the interest, but it foregoes claiming the $64,000, and claims only the interest.
We consider first the plaintiff’s contention that, under the applicable statutes, the underpayment was not a deficiency, bearing statutory interest, but was a mere failure to pay a contract debt. It would seem that, the plaintiff having paid its taxes in the correct amount, an overestimate of what those taxes would be, which resulted in giving the plaintiff $64,000 too much credit against its contract debt of $800,000 to the Government, would not result in an underpayment of tax, because the tax had in fact been paid in full. It would be merely a mistaken credit against the contract debt.
. Section 271 of the Internal Revenue Code of 1939, as it read before it was amended in 1944, in general defined a deficiency as the amount by which the tax really owing exceeds the amount shown on the taxpayer’s return, plus other amounts previously assessed and minus amounts “previously abated, credited, refunded or otherwise repaid in respect of such tax.” Under that statute it could well be urged that the $64,000 had, in effect, been “credited” to the plaintiff *322 “in respect of” its 1944 taxes, since the excessive credit on its renegotiation debt arose out of a computation of its 1944 taxes. In Baltimore Foundry and Machine Corporation, 7 T.C. 998, and Stow Manufacturing Company, Inc., 14 T.C. 1440, affirmed 190 F. 2d 723 (CA2), cert. den. 342 U.S. 904, which were governed by section 271 before its amendment in 1944, it was held that an erroneous section 3806 credit resulted in a deficiency.
Section 271 was amended by section 14 of the Individual Income Tax Act of 1944, 58 Stat. 231, 245. As amended, its subsection (a) defined a deficiency as the amount by which the tax really owing exceeds the amount shown on the return, plus amounts previously assessed and minus
(2) the amount of rebates, as defined in subsection (b) (2), made.
Then subsection (b) of section 271 defines “rebate” as follows:
(2) The term “rebate” means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by this chapter was less than the excess of the amount specified in subsection (a) (1) over the amount of rebates previously made; and $ # * * *
We take this cryptic language to mean that, to be a “rebate” which, if erroneously made, may be corrected by the assessment of a deficiency, the rebate must be a credit or refund previously given or made on the ground that the taxpayer was supposed to have overpaid his tax. The $64,000 here under discussion was credited to the plaintiff, not on the ground that it was supposed to have overpaid its tax, but on the mistaken ground that it had paid more tax, on an item eliminated by the negotiation from its income, than it had actually paid and was therefore entitled to more credit against its contract debt than it was in fact entitled to.
Section 271, as amended in 1944, and as applicable to the instant case, does not contain the flexible language about credits or refunds “in respect to such tax” which it contained before its amendment in 1944. Yet in Morris Kurtzon, 17 T.C. 1542, involving a tax year to which section 271 as amended was applicable, it was held that a section 3806 credit *323 constituted a “rebate.” The opinion did not advert to the change made by the amendment of section 271.
We think it is not correct to regard the erroneous credit given to the plaintiff as being a “rebate” on its taxes, within the meaning of section 271. If not, the mistaken credit on the plaintiff’s renegotiation debt did not create a deficiency in the plaintiff’s tax payments, but rather gave rise to an underpayment of its contract obligation. Statutory interest applicable to a deficiency was, therefore, not properly chargeable.
The Government argues, in the alternative, that even if the $64,000 shortage was a contract debt rather than a deficiency, the debt nevertheless bore interest and hence the plaintiff has not paid more than it owed.
A debt owing to the United States bears interest, even though there is no statute or contract so providing. Billings v. United States, 232 U.S. 261, 288; Royal Indemnity Co. v. United States, 313 U.S. 289, 295, 296; United States v. Wissahickon Tool Works, 200 F. 2d 936, 942. These cases hold that the rate of interest is to be determined by the Court. In Eversharp, Inc. v. United States, 129 C. Cls. 772, this court held that 4 percent was a fair rate of interest upon a debt owing to the United States as a result of a renegotiation of a war contract.
The renegotiation agreement in the instant case provided that the plaintiff would pay the agreed amount “within ten (10) days after contractor shall have received a fully executed counterpart of this agreement or within ten (10) days after receipt of tax credit determination referred to in Article 3 herein, whichever date is the later.” The plaintiff had received the tax credit determination by November 9, 1945, because on that day it paid the Government the amount not covered by the tax credit. The agreement further provided:
Interest at the rate provided by law in the District of Columbia as the rate which is applicable in the absence of express contract as to the rate of interest, shall accrue and be payable upon each payment due under this agreement from and after the due date thereof * * *.
*324 The District of Columbia Code, c. 27, § 28-2701, provides for interest at 6% in such situations.
The plaintiff urges that the allowance of interest, in the absence of an agreement to pay interest, or in the case of an unclear agreement, is a matter of equity, and that there is no equity in the Government’s position in this case. The plaintiff says that it was not notified of any default on its part until the Government, in 1953, asserted the deficiency which 'is the subject of this suit. The plaintiff cites United States v. United States Fidelity Co., 236 U.S. 512, 530, rejecting a claim of the United States for interest against a surety, prior to the time when the surety was notified that the principal was in default. It cites District Court cases rejecting claims for interest on excessive profits prior to the time when the United States demanded repayment of the excessive profits, United States v. Jackson, 131 F. Supp. 642 (D.C. Mich.), or prior to the time that any serious effort was made to recover them, United States v. Douglas, 151 F. Supp. 254 (D.C. Fla.).
The plaintiff says that it was an “innocent debtor” and that it “never suspected that it owed the War Department a single dollar.” It would be remarkable if a taxpayer, even one used to dealing in large figures, would fail to notice that it had been credited, against an agreed renegotiation debt of $812,586,* with having paid $63,920.77 more taxes than it had in fact paid. To credit the plaintiff with ignorance of the facts we would have to assume that the plaintiff’s bookkeeping was as slipshod as that of the Government which originated the mistake. But we do so assume and consider the case on-that basis.
The plaintiff’s indebtedness to the Government for the $812,586 was fixed beyond argument, by agreement. It would take just that many dollars to pay it. There was no debatable question such as whether the plaintiff’s profits had been excessive, which had to be resolved in order to mature the plaintiff’s debt. There is enough ambiguity in the confused situation to enable the plaintiff to escape from the six-percent provision in its agreement, but not enough to make *325 it equitable for it to escape the payment of anything at all for the use of the Government’s money, left in the plaintiff’s hands as a result of an obvious mistake. We conclude, as we did in Eversharp, supra, that four percent interest on the unpaid $63,920.77 of the renegotiation debt would be equitable. Interest so computed from November 9, 1945, may be set off against the amount otherwise recoverable by the plaintiff. The plaintiff may have a judgment for the balance, together with interest as provided by law. The amount of the judgment will be determined in further proceedings pursuant to our Rule 38(c).
It is so ordered.
Reed, Justice (Bet.), sitting by designation; Littleton, Judge (Ret.); LaRamoRE, Judge; and Jones, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Riegel Textile Corporation, is a corporation duly organized under the laws of Delaware with its principal offices at 260 Madison Avenue, New York, New York. On or about June 16, 1946, plaintiff, in exchange solely for its voting stock, acquired all of the assets and assumed all of the liabilities of Ware Shoals Manufacturing Company, Inc. (hereinafter called “Ware Shoals”), a corporation duly organized under the laws of South Carolina, such acquisition having been a tax-free reorganization under the Internal Revenue Code of 1939.
2. In a renegotiation agreement between the United States of America and Ware Shoals dated August 24, 1945, it was determined and agreed that $812,586 of the profits received or accrued by Ware Shoals under war contracts during the calendar year 1944 should be eliminated pursuant to the Renegotiation Act.
3. Under paragraph 3 of the renegotiation agreement, Ware Shoals represented that the eliminated profits of *326 $812,586 were included in income on its Federal income and ■excess profits tax returns for the year 1944; that it had applied or would promptly apply for a recomputation by the Bureau of Internal Revenue of the amount by which its taxes for such years under chapters 1, 2A, 2B, 2D, and 2E of the Internal Revenue Code are decreased by reason of the application of section 3806 of such Code; and that the amount so computed will be allowed as a credit against the amount of the profits agreed in Article 1 to be eliminated.
4. By letter dated August 28, 1945, the Internal Revenue Agent in Charge advised the Quartermaster General that ■on the basis of the retained copies of returns for the year 1944 presented by Ware Shoals and upon the understanding that profits of $812,586, which were determined excessive, were included in income on such returns, the amounts by which the taxes for the taxable year covered by such returns are decreased by reason of the application of paragraph (1) of subsection (a) for the purpose of section 3806(b) (1) of the Internal Revenue Code are as follows: income tax and surtax, chapter 1, None; surtax, chapter 2A, None; declared value excess profits tax, chapter 2B, $13,576.35; tax under ■chapter 2D, None; excess profits tax, chapter 2E, $639,-207.72;[1] aggregating $652,784.07. The letter also stated it was to be further understood that the computation of the foregoing amounts was based upon the assessments made to date of such taxes whether or not paid.
5. By letter dated November 14, 1945, the Quartermaster General advised the Internal Revenue Agent in Charge at Columbia, South Carolina, that a renegotiation settlement had been concluded with Ware Shoals whereby the amount ■of eliminated excessive profits for the year 1944 was $812,586 ■against which an offsetting tax credit of $652,784.07 was applied, leaving a net amount of $159,801.93 repaid to the Government by Ware Shoals. The aforesaid repayment pursuant to the renegotiation agreement was made by Ware Shoals on or about November 9,1945. The Revenue Agent in Charge thereafter impressed upon the returns filed by Ware Shoals for the year 1944 a stamp showing the credit *327 of $652,784.07 allowed under section 3806(b) of which .$13,576.35 was declared value excess profits tax and $639,207.72 was excess profits tax. The credit of $639,207.72 in excess profits tax is 80 percent[2] of the eliminated profits ■of $812,586, minus the credit for declared value excess profits tax of $13,576.35 or the amount of $799,009.65.[3]
6. After the granting of an extension of time, Ware Shoals, on April 6, 1945, timely filed its corporation income and declared value excess profits tax return for the calendar year 1944, reporting thereon a net income of $2,955,880.77 and declared value excess profits tax of $13,576.35 and a normal tax of $223,643.61. The total tax of $237,219.96, together with interest of $15.54, was assessed against Ware Shoals and was paid by it during the year 1945. On the same date, April 6, 1945, Ware Shoals timely filed its excess profits tax return for the calendar year 1944, reporting thereon a surtax net income of $2,942,125.92, and an excess profits tax of $2,130,057.13,[4] together with interest thereon of $27.12, which amounts were assessed against Ware Shoals and were paid by it during the year 1945, except that on November 7, 1945, $213,005.71 of such tax was abated pursuant to section 784(a) of the Internal Revenue Code of 1939, as added by the Tax Adjustment Act of 1945. Thereafter, on November 15, 1945, Ware Shoals filed amended corporation income and declared value excess profits tax and excess profits tax returns for the calendar year 1944.[5] These amended returns reported additional declared value excess profits tax of $1,333.01 and excess profits tax of $13,582.14.[6] The declared value excess profits tax with in *328 terest thereon of $54.63 and the excess profits tax with interest thereon of $556.68 were assessed against Ware Shoals and were paid by it on November 28,1945.
7. By consents filed by Ware Shoals, the period fixed for assessment of income, declared value excess profits and excess profits taxes for the year 1944 was extended to and including June 30, 1953, except that if a notice of deficiency was issued before such date, then the time was extended by the number of days during which the Commissioner was prohibited from making an assessment and for 60 days thereafter.
8. After completion of an examination of the Ware Shoals books and records for the years 1942 to 1945, inclusive, the revenue agent prepared a report dated May 7, 1952, a copy of which was forwarded to the taxpayer under date of May 14, 1953. The revenue agent’s report disclosed the determination of taxable income and the computation of tax liabilities for the year 1944.[7] The deficiency in income tax of $4,062.77 was assessed, together with interest thereon of $2,020.42, on June 29,1953, and these amounts were satisfied by credit of $1,148.93 on July 16, 1953, credit of $4,062.77 on July 28, 1953, and the balance of $871.49 was abated on October 26, 1953, as an excess computation of interest. The overassessment of $1,333.01 of declared value excess profits tax and interest paid thereon of $54.63 was listed on schedule dated June 16, 1953, and applied as a credit against the determined deficiency. The deficiency in excess profits tax of $83,037.37 was assessed, together with interest thereon of $41,294.59, on June 29,1953, and these amounts were satisfied by credit of $236.71 on July 16,1953, credit of $33,507.21 on July 28, 1958, payment of $83,397.12 on July 27, 1953, and *329 the abatement of interest in the amount of $7,190.92 on October 26,1953.
9. On December 23, 1954, Riegel Textile Corporation as successor to Ware Shoals, filed a claim for refund for the jear 1944 in the amount of $63,920.77.[8] By letter dated June 1, 1955, the Riegel Textile Corporation was notified by registered mail of the disallowance in full of the aforesaid claim for refund.
10. If the excess profits tax credit had been computed initially by the Internal Revenue Service on the basis of 72 percent instead of 80 percent, Ware Shoals would have been required by the renegotiation agreement to pay to the War Department in 1945 the sum of $63,920.77 in addition to the sum actually paid, whereupon both the deficiency and the interest thereon, determined and assessed as described in finding 8, would have reflected lesser amounts.[9]
CONCLUSION OE LAW
Upon the foregoing findings of fact,- which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover with interest as provided by law. Said recovery shall be subject to an offset of interest on the unpaid $63,920.77 of the renegotiation debt at the rate of four percent per annum beginning on November 9, 1945. Judgment will be entered to that effect with the amount of recovery to be determined pursuant to Rule 38(c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on June 3, 1960, that judgment for the plaintiff be entered for $8,780.96, together with interest thereon as provided by law.

We now use the exact figures Involved In the Instant case, rather than the rounded figures used earlier in this opinion.

 This sum was computed by tbe Internal Revenue Service as tbe decrease In excess profits tax attributable to tbe $812,586 of determined excess profits. See tbe last sentence of finding 5.

 Section 3 of tie Tax Adjustment Act of 1945, approved July 31, 1945, .and applicable to the calendar year 1944, reduced the excess profits tax rate of 80 percent by 10 percent thereof, resulting in an effective rate of 72 percent.

 Seventy-two percent of $799,009.65 amounts to $575,286.95. The difference between $639,207.72 (80 percent of $799,009.65) and $575,286.95 is $63,920.77.

 As shown on the taxpayer’s excess profits tax return for 1944, the tax of $2,130,057.13 reflected the balance after deduction of $223,643.61 “income tax under Chapter 1” from $2,353,700.74, representing 80 percent of $2,942,125.92.

 The amended excess profits tax return listed excess profits tax of $2,145,-148.40, reflecting an increase of $15,091.27 over the $2,130,057.13 initially reported. The amended return was computed on the same 80-percent basis •described in the preceding footnote.

 This figure reflects the $15,091.27 mentioned in the preceding footnote, reduced by 10 percent, the amount abatable under section 784(a) of the Internal Revenue Code of 1939.

 The report listed the excess profits tax “previously assessed” for 1944 as $1,291,425.84, derived as follows:
■Originally assessed_$2,130, 057.13
■Deficiency assessed on amended return 1945_ 13, 582.14
Credit due to renegotiation, Sec. 3806(h), 1945_ (639, 207. 72)
Credit allowed under See. 784_ (213,005. 71)
Net previous assessment- 1, 291,425. 84
The report likewise listed the taxpayer’s “liability” for excess profits tax for 1944 as $1,374,463.21, andi the “deficiency” (as one of the “adjustments proposed in this report”) as $83,037.37.
The foregoing computations were predicated on a “renegotiation refund” of $812,586.

 The statement of claim contained the following assertion: “The difference between $652,784.07 (tax at the 80% rate) and $588,863.30 (tax at the 72% rate) or $63,920.77 (10% of excess profits tax credit of $639,207.72) Is owed to the United States on account of renegotiation of war contracts, but Is not owed as a deficiency In excess profits tax.”

 According to plaintiff's computation, the arithmetic of which has not been challenged by defendant, .the 1953 deficiency would hare been $19,116.60 (the difference between $83,037.37 and $63,920.77) instead of $83,037.37, and the Interest on the deficiency would have been $7,851.24 instead of $34,103.67. The difference in Interest Is $26,252.43.