ESTATE of Robert A. GOODALL, Deceased, C. M. Goodall, Executrix, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

ESTATE of Robert A. GOODALL, Deceased, Clarice M. Goodall, Executrix, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent (two cases).

ESTATE of Robert A. GOODALL, Deceased, Clarice M. Goodall, Executrix, and Clarice M. Goodall, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

C. M. GOODALL, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

GOOD–ALL ELECTRIC MFG. CO., Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 18631–18636.

United States Court of Appeals
Eighth Circuit.

March 5, 1968.

James W. R. Brown, Omaha, Neb., for petitioner; James J. Fitzgerald, Jr., Omaha, Neb., on brief and reply brief.

Louis M. Kauder, Atty., Dept. of Justice, Washington, D. C., for respondent; Mitchell Rogovin, Asst. Atty. Gen., Dept.

of Justice, Washington, D. C., and attorneys Lee A. Jackson, Crombie J. D. Garrett, Grant W. Wiprud, Thomas L. Stapleton and Robert J. Campbell, Washington, D. C., on the brief.

Before VOGEL, Senior Circuit Judge, and BLACKMUN and HEANEY, Circuit Judges.

BLACKMUN, Circuit Judge.

Robert A. Goodall died October 22, 1953.

The Commissioner of Internal Revenue, by his several 90-day letters, proposed deficiencies and additions[1] to tax as follows:

| | |
|---|---|
| Estate of Robert A. Goodall, deceased (Our No. 18,631; Tax Court No. 72,-361) | Federal estate tax. |
| Estate of Robert A. Goodall, deceased (Our No. 18,632; Tax Court No. 95,387) | Income tax for the calendar year 1953; addition under § 291(a) of the 1939 Code. |
| Estate of Robert A. Goodall, deceased (Our No. 18,634; Tax Court No. 3142-63) | Income tax for the calendar year 1954; addition under § 6651(a) of the 1954 Code. |
| Mr. and Mrs. Goodall (Our No. 18,-633; Tax Court No. 95,388) | Joint income tax for the calendar years 1950/53, inclusive; § 293(a) addition for each of the 4 years; § 294(d) (1) (B) addition for 1951; § 294(d) (2) addition for 1950/52, inclusive. |
| Mrs. Goodall (Our No. 18,635; Tax Court No. 3143-63) | Income tax for the calendar years 1954/59, inclusive; § 294(d)(1)(A) addition for 1954. |
| Good-All Electric Mfg. Co. (Our No. 18,636; Tax Court No. 95,458) | Corporation income tax for the fiscal years ended May 31, 1950/54, inclusive; § 102 surtax for all 5 years. |

———◆———

The deficiencies so proposed exceeded, in the aggregate, $6,300,000, and the additions totalled more than $545,000. By amended answer filed in the estate tax case, the Commissioner proposed a further deficiency of $281,388.03. Thus, more than $7,125,000 in tax deficiencies and additions, plus interest, were asserted. Except for about $195,000 of the corporation's tax, almost all of this large amount was disputed.

The Tax Court consolidated the several cases for hearing. Its detailed find-

---

1. Section 291(a) of the 1939 Code and § 6651(a) of the 1954 Code impose an addition to tax for failure to make and file a return. Section 293(a) imposes an addition for a deficiency due to negligence or intentional disregard of rules and regulations but without intent to defraud. Section 294(d) (1) (A) imposes an addition for failure to make and file a timely declaration of estimated tax. Section 294 (d) (1) (B) imposes an addition for failure to make a timely payment of an instalment of estimated tax. Section 294 (d) (2) imposes an addition for a substantial underestimate of estimated tax.

ings and opinion (Judge Mulroney) filed June 4, 1965 (not reviewed by the full court), T.C. Memo 1965–154, 24 T.C.M. 807, and its subsequent computational decisions under its Rule 50, filed July 26, 1966, redetermined deficiencies in the substantially reduced total net amount [2] of $2,214,677.63, and additions aggregating $146,489.65. The respective taxpayers petition for review of certain aspects of these redeterminations. Our jurisdiction is established.

The facts, as found by the Tax Court, are based on stipulations, oral testimony, a deposition, and many exhibits, some jointly stipulated or jointly introduced. The factual material is, of course, intricate and complex. We mention initially only a few background facts. Others are referred to as we consider the respective issues.

The decedent, Robert A. Goodall, and his wife, Clarice M. Goodall, were equal business partners under an agreement executed by them on December 10, 1916, shortly after their marriage. This partnership continued from that date until Mr. Goodall's death on October 22, 1953. Prior to May 28, 1949, the partnership operated an electronics business in Ogallala, Nebraska. It manufactured and sold capacitors, rectifiers, soldering machines, watch cleaning machines, and fishing reels. The capacitors were for proximity fuses for the United States Navy; the partnership had been approved by the Department of the Navy as an authorized supplier.

In 1940 the Goodalls organized a Nebraska corporation under the name of Ogallala Industries, Inc. It was inactive, however, and its charter lapsed in 1944. The Goodalls revived the corporation in 1947. In April 1949 its name was changed to Good-All Electric Mfg. Co. This is the taxpayer in our No. 18,636. It is hereinafter referred to as the corporation.

On May 28, 1949, the partnership and the corporation executed a Manufacturing and Rental Agreement under which the corporation on June 1 took over the manufacturing business theretofore conducted by the partnership.

The issues before us are:

I. The existence of Tax Court jurisdiction in the face of the taxpayers' claim that the Commissioner failed to make the statutorily required determinations of deficiencies. This issue arises in all six cases.

II. The sufficiency of the evidence to support the Tax Court's finding that the partnership's interests in certain oil leases had a value of $2,400,000 at the decedent's death. This issue arises in the estate tax case.

III. The informational sufficiency of that finding.

IV. The sufficiency of the evidence to support the Tax Court's finding that the partnership, at the decedent's death, possessed a $940,000 asset consisting of "Intangibles—goodwill". This also arises in the estate tax case.

V. The sufficiency of the evidence to support the Tax Court's finding that the corporation, in each of its fiscal years 1950/54, inclusive, permitted its earnings and profits to accumulate beyond the reasonable needs of its business, within the meaning of § 102(c) of the 1939 Code.

VI. The sufficiency of the evidence to support the Tax Court's finding that in those years the corporation was availed of for the purpose of preventing the imposition of surtax upon its shareholders, within the meaning of § 102(a).

VII. The propriety of the Tax Court's not taking certain taxes and withdrawals into account in its compilation of the § 102 surtax.

VIII. The expensing of the partnership's intangible drilling and development costs. This issue arises in the Goodalls' income tax case, in the estate's two income tax cases, and in Mrs. Goodall's income tax case for 1954.

IX. The deductibility of certain legal fees and expenses incurred by the part-

2. Overpayments were redetermined for Mrs. Goodall for 1958 and 1959.

nership. This arises in the Goodalls' income tax case for 1952.

X. The treatment of 1953 partnership income in the computation of the estate's basis in its partnership interest. This arises in Mrs. Goodall's income tax case.

XI. The measure of the 5% addition to tax under § 293(a) of the 1939 Code. This arises in the Goodalls' income tax case for 1951 and 1953.

We consider these issues in the order listed. Before we do so, however, we think it well to list certain matters which are not at issue on these petitions for review:

1. Not at issue is the legal efficacy of the 1916 partnership agreement between Mr. and Mrs. Goodall. This is therefore to be accepted as a genuine and fully effective business arrangement between the spouses.

2. Not at issue in the estate tax case is the elimination of an increase of $123,208.35, effected by the Commissioner, in the value of the decedent's partnership interest to reflect the difference in amounts withdrawn respectively by Mr. and Mrs. Goodall from the corporation and treated by them as partnership income. The Tax Court sustained the Commissioner in this increase. However, with the efficacy of the partnership agreement accepted, the Commissioner now concedes the increase to have been improper. Accordingly, on remand, the estate tax must be appropriately adjusted for this item.

3. Not at issue is a deduction of $109,683.70 asserted by Mrs. Goodall in her 1956 return as interest paid that year to the District Director at Omaha with respect to income tax deficiencies for 1950/53. The Director, on receipt of the payment, placed it in his suspense account. The Commissioner disallowed the interest deduction and the Tax Court sustained him on the authority of Jacob J. Shubert, 41 T.C. 243 (1963) (taxpayer's petition for review by the Second Circuit dismissed pursuant to stipulation). The Commissioner now concedes that "the interest payment was received and acknowledged as such" by him and that the deduction was proper. Accordingly, on remand, Mrs. Goodall's 1956 tax must be appropriately adjusted for this item.

4. Not at issue are the corporation's deductions in fiscal 1950/54 of amounts accruing to the partnership under the manufacturing and rental agreement. The Commissioner disallowed the major portion of these on the ground that they were not ordinary and necessary business expenses under § 23(a) (1) (A) and thus were equivalent to dividends. The Tax Court, however, held that the amounts were deductible in their entirety. The Commissioner has not petitioned for review of this ruling which is adverse to him.

5. Not at issue is the character of the substantial withdrawals made by the partners from the corporation. The Commissioner determined that these withdrawals were not loans, as the partners claimed, but were taxable dividends. The Tax Court concluded that they were loans and thus were not includable in partnership gross income. Here, too, the Commissioner has not petitioned for review of this ruling which is adverse to him.

I. The jurisdictional issue. Did the Commissioner fail to make the deficiency determinations required for Tax Court jurisdiction?

The argument here advanced by the respective taxpayers[3] is that, in the administration of the federal income and estate taxes, self-assessment is basic; that the Commissioner, when a return is filed, is required, under §§ 57 and 840 of the 1939 Code,[4] to determine the cor-

---

3. We place to one side the fact that the taxpayers, who originally invoked the jurisdiction of the Tax Court, are now the ones attacking that jurisdiction on grounds not going to subject matter.

4. These sections have no counterpart in the 1954 Code.

rect tax; that only if he determines that the correct tax exceeds the returned amount is he authorized to issue a notice of deficiency; that the process of determination requires that he resolve all issues, citing Terminal Wine Co., 1 B.T. A. 697, 701 (1925); that notice of the deficiency so determined is a prerequisite for Tax Court jurisdiction under § 272 (a) (1) [and § 871(a) (1)] of the 1939 Code and §§ 6212(a) and 6213(a) of the 1954 Code; that, in order to constitute a determination, the Commissioner's action must be "thoughtful and considered" and bona fide and not "a mere formal demand for an arbitrary amount as to which there were substantial doubt"; that only when there has been appropriate administrative action of this kind do the courts become involved; that in the estate tax case the Commissioner expressly acknowledged that he had not determined the deduction [in any amount in excess of $234,444.81] for income tax claims against the decedent [inasmuch as they were then being contested, beyond that figure, by the estate]; that there was no reason why he could not make a decision with respect to those claims; that he had taken inconsistent positions within and among the several cases; that this is so with respect to valuation, basis, an option choice, and the interpretation of certain transactions; that it is not a situation where several taxpayers were taking different positions on the same issues; that, indeed, the sole party in interest in all the cases (except the corporation) is Mrs. Goodall; that she and the corporation have not taken any inconsistent position; that the Commissioner's inconsistency is unconditional and not in the alternative; and that this has compelled the taxpayers to go to the Tax Court in order to avoid assessment.

The Tax Court refused to hold that the Commissioner was acting capriciously or arbitrarily. It observed that it was clear that the determinations, although inconsistent, were made in the alternative and that "once a holding is reached on an issue it will be applied consistently where more than one taxpayer is involved".

We decide this jurisdictional issue against the taxpayer and do so for a number of reasons:

1. The provisions in § 272(a) (1) of the 1939 Code and § 6212(a) of the 1954 Code as to the determination of a deficiency do not specify that the determination be one which is fully consistent with every other determination made contemporaneously against a related taxpayer. Where there is no charge or indication of bad faith on the part of the Commissioner we are not disposed to read into the statute any such additional requirement for across-the-board legal theory consistency.

2. We see nothing inherently evil in the Commissioner's making inconsistent determinations as between taxpayers where, as here, there is acceptable legal theory for each approach and where the determination falls short of the frivolous or the unfair.

3. We perceive no element of genuine prejudice to the taxpayers despite their comment that, had the Commissioner acted otherwise, "these cases would have been resolved many years ago without the necessity of involving the courts". On the other hand, to compel the Commissioner to choose between good faith alternatives at the risk of later confrontation with the barrier of the statute of limitations, if his choice has been litigated and has not prevailed, could entail grave prejudice for the revenues and could result in a windfall to a taxpayer by way of escape from a just obligation otherwise due and collectible.

4. These are, after all, tax cases. Substantial sums are involved. The Commissioner is charged with the protection of the revenues. While these factors might be viewed as pragmatic, it would be unseemly, we feel, to force the Commissioner, in the performance of his administrative duties, to make an awesome choice of this kind at his peril. Taxes are not a game. Of course, the Commissioner, and the government itself, in this court is no more and no less than just another litigant. But we are aware of

every person's tax responsibilities and we are not inclined to let the realization of revenues stand or fall on so technical a base as impeccable consistency. Consistency is desirable but its virtue has limits. Good faith inconsistency buttressed by acceptable argument, when considered in the framework of the Commissioner's responsibilities, cannot be regarded as an offense which provides a bar to bona fide tax litigation.

5. Inconsistency in determinations, when they are not made in bad faith, does not equate with an absence of the statutorily required determination, as the taxpayers suggest. Each taxpayer, even though there are several related ones, by the determination and notice made for him, knows the position the Commissioner is taking with respect to his tax situation. So long as the ultimate resolution of the issues is consistent for all, we see no legal wrong.

6. We are not contrarily persuaded by the taxpayers' argument that Mrs. Goodall is the sole party in interest, other than the corporation, because she is the surviving spouse, is the survivor of the husband-wife partnership, is the sole executor of her husband's will, and is the sole beneficiary of his estate, and that, therefore, the inconsistencies here exist with respect to the same taxpayer. The decedent, the estate, Mrs. Goodall, and the partnership are all distinct in tax law, either as separate tax paying entities or, in the case of the partnership, as an information reporting entity. This separateness has tax significance and, after all, the method of filing returns, the doing of business in the partnership form, and the disposition of Mr. Goodall's estate, are products of considered choice by the taxpayers or one or more of them.

7. The Ninth Circuit has touched upon this jurisdictional issue in two cases. Revell, Inc. v. Riddell, 273 F.2d 649, 658–660 (9 Cir. 1959), cert. denied 364 U.S. 835, 81 S.Ct. 52, 5 L.Ed.2d 60; Malat v. Commissioner of Internal Revenue, 302 F.2d 700, 704 (9 Cir. 1962), cert. denied

371 U.S. 934, 83 S.Ct. 308, 9 L.Ed.2d 271. It is true that, as the taxpayers point out, Revell was an attempt by plaintiffs to enjoin the collection of income and excess profits taxes. The case thus has overtones of the policy expressed in § 7421(a) of the 1954 Code against suits to restrain tax assessment or collection. And the court there specifically observed, 273 F.2d p. 659, that it was not confronted by any question of the jurisdiction of the Tax Court. Nevertheless, because the requests for equitable relief centered in what was regarded as an absence of determinations, p. 657, "because of the conflicting tax deficiency determinations which were made in each case", the opinion does afford valuable precedent. The Ninth Circuit stressed that there was nothing in the notices which impugned the good faith of the Commissioner; that on the face of each notice it appeared that the determination "was thoughtful and considered"; that the burden on the several taxpayers of contesting the conflicting determinations was about the same as was imposed on any taxpayer dissatisfied with a notice of deficiency; that the bar of the statute of limitations lurks in the background; and that, p. 660, "We find no legal or logical reason which compels the Commissioner to run such risk [of correct choice of theory] in the proper performance of his duty to protect the revenue". Malat is equally positive and, significantly, concerned petitions to review decisions of the Tax Court. It thus met the jurisdictional question directly. There the claim was made that jurisdiction did not exist because "by reason of the conflicting holdings by the Commissioner * * * either no determinations were made or the Commissioner acted arbitrarily and capriciously". The court cited Revell, referred to the statute of limitations, and held that the determinations were valid and that the taxpayers "properly invoked the jurisdiction of the Tax Court". P. 704 of 302 F.2d.

8. We agree with the result reached by the Ninth Circuit.

9. The situation is far different than that condemned in James Couzens, 11 B.T.A. 1040, 1159 (1928), cited by the taxpayers. There the Board of Tax Appeals pointed out that the Commissioner testified that when he made the jeopardy assessments he "was not clear in his own mind that any tax was due".

10. We have encountered inconsistency of determinations before and have not been concerned or impressed with it. See Meyer v. Commissioner of Internal Revenue, 383 F.2d 883, 885, 892 (8 Cir. 1967), affirming Leon R. Meyer, 46 T.C. 65 (1966). There are enough other instances in reported cases to indicate that alternative or contrary determinations in separate notices of deficiencies are not uncommon and have not been condemned by the courts. See Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 309, footnote 1, 76 S. Ct. 395, 100 L.Ed. 347 (1956); Commissioner of Internal Revenue v. Consolidated Premium Iron Ores, Ltd., 265 F.2d 320 (6 Cir. 1959); Nat Harrison Associates, 42 T.C. 601, 617 (1964) (Commissioner's petition for review by the Fifth Circuit dismissed pursuant to stipulation); Sanford Reffett, 39 T.C. 869, 875 (1963) (taxpayers' petition for review by the Fourth Circuit dismissed pursuant to stipulation); L. A. Thompson Scenic Ry., 21 B.T.A. 718 (1930).

11. There is no avowed attempt here to collect more than one tax on the same income. We, as did the Tax Court, feel that it is clear that the determinations were in the alternative and that consistent legal principles were ultimately to be applied.

12. We do not regard the estate tax case as one with no actual determination of deficiency. The 90-day letter precisely proposed and, in so many words, "determined" a deficiency of $280,905.06 in estate tax. This was in part attributable to the Commissioner's limiting the deduction for income taxes of the decedent paid after death, and interest thereon to the date of death, to the amount not then being contested by the estate. The deficiency was thus computed without deduction for any additional pre-death income tax and interest which might later be agreed upon or judicially ascertained. Of course, such additional liability would constitute an appropriate estate tax deduction under § 812(b) (3) of the 1939 Code and would most certainly be claimed by the estate. This, however, does not make the Commissioner's determination something less than a full-fledged one which satisfies the statute. The situation is not unlike that concerning the 80% credit for state death taxes paid; this credit did not enter into the determination of deficiency but it was clear that it would be allowed, in reduction of the deficiency, upon the submission of proper proof of payment within the period provided by law. Although the years were passing, we place upon the Commissioner no positive duty here to fix the pre-death income tax liabilities with finality prior to his making an acceptable and statute-satisfying determination of estate tax deficiency. His action was not unreasonable.

We are satisfied that the jurisdiction of the Tax Court was properly invoked.

II. The first estate tax issue. Does the record support the Tax Court's finding that the partnership's interests in oil leases in the Little Beaver Field in northeastern Colorado had a date-of-death value of $2,400,000 rather than the returned value of $1,353,830?

The decedent's, and hence the estate's, major asset was his half interest in the partnership. The partnership, among other things, was engaged in oil ventures. And among its oil assets were working percentage interests in four leases in the Little Beaver Field.[5] The estate tax return, which was timely filed and which valued the estate's assets as of the date of death, set forth the decedent's share in the partnership at $2,620,000 and the partnership's interests in the four leases

---

5. The Goodall wells under these leases were among the first in production in the Little Beaver Field.

at $1,353,830. This was in accord with the Nebraska Inheritance Tax Appraiser's Report [6] submitted with and as a part of the return.

The Commissioner's audit and his eventual 90-day letter made a number of adjustments in the valuation of the partnership assets and liabilities. These resulted in a determination that the decedent's interest in the partnership was $3,638,850.69. This was an increase of $1,018,850.69 over the reported figure. The major component in the increase was the addition of $940,000 for "Intangibles —goodwill", an asset which did not appear in the return's computations. This item is the subject of the second estate tax issue considered below. The other items, therefore, were relatively minor. As the estate points out, no adjustment was made through the audit period or by the 90-day letter in the valuation of the Little Beaver lease interests.

It was in February 1964, "more than ten years after Mr. Goodall's death and more than seven [six?] years after the deficiency notice was issued", to use the language of the estate's brief, that the Commissioner, by amended answer in the estate tax case, asserted the additional deficiency of more than $280,000 due entirely to a very substantial increase over the returned value of the decedent's share of the partnership's interests in the four leases.

■ Section 6214(a) of the 1954 Code, applicable here (see § 7851(a) (6) (A) of that Code), permits the Commissioner to make an additional claim before or at the hearing in the Tax Court. But such action taken at that time by answer or amended answer places the burden of proof of the issue on the Commissioner. Tax Court Rule 32; Kimbell-Diamond Milling Co., 10 T.C. 7, 13 (1948); Estate of Harry Schneider, 29 T.C. 940, 956 (1958). See Tehan v. Commissioner of Internal Revenue, 295 F.2d 895, 896–897 (7 Cir. 1961).

The Tax Court in its memorandum reviewed the testimony of the four witnesses produced by the Commissioner and their respective discussions and estimates (as of July 15, 1953, and January 1, 1954) of maximum oil reserves (from 13,635,000 to 14,220,000 barrels) in the entire Little Beaver Field; of the partnership's percentage, computed on a decline curve, of the entire field's production (17.37115%); of the val e per barrel of oil indicated by area sales in the summer of 1953 ($1.8793); and of pre-death production from the Goodall leases (416,320 barrels). The court noted that this approach results in a figure of 2,003,047 barrels of net oil reserves attributable to the Goodall leases as of the date of the decedent's death and in a value for the partnership of $3,764,326. The court also noted, however, that, on a separate valuation analysis made by one of the Commissioner's witnesses (Cameron), the oil in the ground would have a value of $1.25 per barrel and that this figure, applied to the net reserve of 2,003,047 barrels and exclusive of possible secondary recovery, results in a total value of $2,503,809 for the partnership interests.

The court then observed that the estate relied upon the testimony of its witness Low who used a different analytical approach. He estimated the reserve for each of the four leases individually and arrived at a total of 1,331,280 recoverable barrels. He then estimated the partnership's future net operating profits at $2,707,840. On the assumption that "a buyer is entitled to approximately a dollar profit per dollar invested" he arrived at, and had no quarrel with, the returned figure of $1,353,830, which obviously is almost exactly half of the estimated future net profit.

The Tax Court then recited that it had "examined in detail the various computations made by the parties and * * * paid special attention to the underlying estimates and assumptions". It stated,

6. This came into being under the state procedure prescribed by Nebraska R.R.S.1943 § 77–2019 to –2024 (1966).

"We are satisfied that the basic approaches adopted by the parties in placing a value on the relevant oil reserves are valid". It went on to say, however, that it was convinced that the Commissioner's proposed figure was excessive "since we believe some of the underlying estimates are too high", inasmuch as they were "maximum figures of probable oil production from the entire field", and because the per barrel figure of $1.8793 "is not without its infirmities". It then said,

> "We do not believe it would be necessary to make a further detailed analysis of the evidence. Taking into consideration all of the evidence and making all the adjustments we deem appropriate, we find that the fair market value as of October 22, 1953 of the interests held by the partnership of R. A. and C. M. Goodall in the Little Beaver Field was $2,400,000."

This conclusion is an increase of more than a million dollars over the returned figure of $1,353,830.

We note, initially and for what it may be worth:

a. The Tax Court's figure of $2,400,-000 is not too far from the midpoint ($2,-559,078) between the $3,764,326 proposed by the Commissioner's witnesses and the $1,353,830 proposed by the estate's witness. One might superficially argue or cynically comment, therefore, that the Tax Court compromisingly decided the issue down the middle.

b. The difference in the Commissioner's and the estate's respective results is attributable primarily to the disparities in the estimates of oil reserves and in the per barrel values.

c. Two of the Commissioner's geologist witnesses had appeared on behalf of Mr. Goodall in 1953 before the Colorado Public Utilities Commission and had presented some of their same material in connection with an application for a pipe line to the Little Beaver.

Generally, value is a fact to be found and usually is not to be established on the basis of fixed rules or formulas. Hamm v. Commissioner of Internal Revenue, 325 F.2d 934, 937–938 (8 Cir. 1963), cert. denied 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046; Arc Realty Co. v. Commissioner of Internal Revenue, 295 F.2d 98, 103 (8 Cir. 1961). See Churder v. United States, 387 F.2d 825. (8 Cir. 1968). The clearly erroneous standard and its accompanying rules apply, as has been noted by the Supreme Court and several times by this court, to findings of fact made by the Tax Court. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed. 2d 1218 (1960); Loco Realty Co. v. Commissioner of Internal Revenue, 306 F.2d 207, 209 (8 Cir. 1962); Idol v. Commissioner of Internal Revenue, 319 F.2d 647, 651 (8 Cir. 1963); Banks v. Commissioner of Internal Revenue, 322 F.2d 530, 537 (8 Cir. 1963); Wells-Lee v. Commissioner of Internal Revenue, 360 F.2d 665, 668 (8 Cir. 1966). Judge Learned Hand observed that the powers of review of a court of appeals "are very straitly limited upon all issues of fact * * * and that limitation is particularly narrow when the issue is one of value". Sisto Financial Corp. v. Commissioner of Internal Revenue, 149 F.2d 268, 269 (2 Cir. 1945). We have joined in this observation. Hamm v. Commissioner of Internal Revenue, supra, p. 938 of 325 F.2d; Arc Realty Co. v. Commissioner of Internal Revenue, supra, p. 103 of 295 F.2d.

On the other hand, the Tax Court's finding of fact is not binding upon a court of appeals if there is no substantial evidence to sustain it, or if it is against the clear weight of the evidence, or if it is induced by an erroneous view of the law. Campbell County State Bank Inc., of Herreid, S. D. v. Commissioner of Internal Revenue, 311 F.2d 374, 377 (8 Cir. 1963).

In the light of these principles we conclude that the record does contain evidence sufficiently supportive of the

finding that the partnership interest in the four leases had a value of $2,400,000:

1. By the time of the decedent's death 24 wells had been drilled in the Goodall leases in the Little Beaver Field. None was drilled thereafter. The partnership was then receiving about 22% of the field's total production. By the end of 1953, 60 wells, out of an ultimate total of 71, had been drilled in the entire field and there were only 240 undrilled acres in an area of approximately 16 square miles. An activity level of a sort had thus been reached.

2. We see nothing improper, under the circumstances here, in the use of estimates for the entire field, as the Commissioner's witnesses chose to do, and we find no legal imperative for restricting testimony to a consideration of only the individual leases. These are but differing approaches and different tools for the solution of the evaluation problem. And we do not regard the use of decline curves here as farcical, as the estate charges.

3. Various factors and approaches have proved to be acceptable in the evaluation of interests in oil leases for federal tax purposes. See Treas.Regs. 118, § 39.23(m)–7 and –9 (1953); Treas.Regs. § 1.611–2 (1967). Among these are comparable sales, analytical appraisals by experts, royalties paid, and state and local property tax valuations. The Commissioner here used analytical appraisals with sales references. The estate presented an opposing analytical appraisal. The Tax Court found each approach a valid one. The respective witnesses were experts in their field and technically well informed. Their testimony covered a wide range and, among other things, touched upon proportion of wells drilled; ultimate totals; decline curves; recoverable barrels; unitization; secondary recovery (although remote in 1953); underlying sand formations; and oil per acre foot. The record is full and adequate and is not without helpful evidence for the resolution of an issue which is usually difficult and which, when resolved, is at best only an approximation.

4. We would unduly lengthen this already too long opinion by a detailed summary of the respective analytical appraisals. It suffices to say that we, as did the Tax Court, feel that each side's approach was valid and presented acceptable material. The choice between them, then, is obviously one for the factfinder.

5. The Tax Court's ultimate finding of a $2,400,000 value is within the range of the estimation figures submitted by the several witnesses. When each and all of these figures are estimates and are based on so elusive a factor as human judgment, we cannot say that a figure within the range is invalid merely because no one of the witnesses mentioned that precise figure. We sustain no element of shock or disbelief by the court's finding and by its tempering what it felt to be figures excessively high and excessively low. And we are far, indeed, from that "definite and firm conviction that a mistake has been committed", which the Supreme Court has employed as an indicator of the clearly erroneous finding. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

6. We regard as particularly pertinent, furthermore, the estimate by witness Cameron on his separate valuation analysis that the total value of the partnership interests was $2,503,809. This represents only a 4.33% differential from the Tax Court's holding. Surely this is an insignificant variance among figures of this size when every bit of testimony rests on only estimational foundations. The Cameron testimony alone supports the Tax Court's finding.

We therefore conclude that the record contains adequate support for the $2,-400,000 valuation and that the Commissioner sustained his burden of proof with respect to this issue.

III. The second estate tax issue. Is this valuation finding informationally sufficient?

■ The estate makes a secondary attack on the evaluation finding itself. It argues that the Tax Court drew a general conclusion increasing the value of the leasehold interests by more than a million dollars over the returned figure but explained the increase only by rejecting the Commissioner's estimates as excessive and making "all the adjustments we deem appropriate"; that such a decision "simply cannot stand"; and that the finding is so general as to be legally insufficient because there is nothing which indicates the path by which the Tax Court reached its conclusion. Cited as supporting authority are expressions in the condemnation commission case of United States v. Merz, 376 U.S. 192, 198, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964) and in the Interstate Commerce Commission case of Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962), and our own condemnation commission case of United States v. Bell, 363 F.2d 94 (8 Cir. 1966), and Campbell County State Bank v. Commissioner of Internal Revenue, supra.

Section 7459(b) of the 1954 Code, applicable here (see § 7851(a) (6) (C) (iv) of that Code), places upon the Tax Court the duty to make written findings of fact. Indeed, it is to "find the facts specially". Section 7482(a) of the 1954 Code and Rule 52(a), Fed.R.Civ.P.; Hamm v. Commissioner of Internal Revenue, supra, p. 938 of 325 F.2d.

This very argument was raised and rejected by this court in the Hamm case. There we observed, pp. 937 and 939 of 325 F.2d, that the taxpayers argued "that the Tax Court failed to find the facts specially" and "that there is no way of ascertaining how the Tax Court arrived at its value determination; that although the court listed in general terms several factors it said it had taken into consideration, it cannot be determined what weight it gave to any of these * * * and that the court did not find the facts specially but pronounced a conclusion and nothing more".

We noted in *Hamm* that the voluminous record did contain adequate supporting material and that

"It is true that the record contains nothing pinned to this exact dollar and cents figure. However, it is well settled that 'Valuation * * * is necessarily an approximation * * *. It is not necessary that the value arrived at by the trial court be a figure as to which there is specific testimony, if it is within the range of figures that may properly be deduced from the evidence' [citations omitted]. * * * We feel that the taxpayers' argument here comes down to a demand for a formula. Formulas, however, are only tools. With the kind of evidence present here, we need not, and do not, go so far as to require that a detailed computation leading to the determined value be present in the Tax Court's findings." Pp. 939–940 of 325 F.2d

We need not decide whether the Supreme Court's pronouncements with respect to a condemnation commission's report and with respect to findings of the Interstate Commerce Commission, respectively set forth in *Merz* and *Burlington*, supra, do or do not have application to findings of the Tax Court. Although the court might have made our task on this review much less burdensome had it expressed its valuation finding in greater detail and had it illuminated every corner of its path to that finding, and thus given us more to work with, we are not inclined to hold, particularly in view of what has been said in the preceding division of this opinion, that the findings do not satisfy the *Merz* and *Burlington* standards, if applicable, or the requirements of Rule 52(a). We can understand the estate's desire for complete detail and specificity, for a large sum is involved and critical analysis and comment are easier if the path of reasoning is indelibly defined. Nevertheless, there is enough here.

IV. The third estate tax issue. Does the record support the Tax Court's finding that the partnership, at the dece-

dent's death, possessed a $940,000 asset consisting of "Intangibles—goodwill"?

The facts pertinent to this issue, listed chronologically, are:

1. Prior to June 1949 the partnership owned and operated the manufacturing business.

2. On May 28, 1949, the corporation and the partnership executed the "Manufacturing and Rental Agreement". Under this the corporation agreed to employ no one other than the two Goodalls; to reimburse the corporation for all other personnel; to pay the expenses of upkeep and maintenance of buildings and equipment; and to pay the partnership 5% of the corporation's gross sales

"for the use of the trade name, plant and equipment formerly used by the partnership in lieu of any royalties for the privilege of manufacturing such products and for the benefit of the industrial 'knowhow' of the engineers and employees of the partnership."

No title to any of the business properties was transferred to the corporation. The agreement was for one year from June 1, 1949, but was renewable annually. It was terminable by the partnership, with or without cause, on 24 hours' written notice.

3. Stock in the corporation appears not to have been both formally and effectively issued until May 31, 1953. At that time 150,000 shares of its capital stock were outstanding in the names of each of the Goodalls in their capacities as partners.

4. During the five fiscal years from the inception of the agreement on June 1, 1949, through May 31, 1954, the payments by the corporation to the partnership under the 5% of gross sales provision of the agreement were:

| Fiscal Year Ended May 31 | Payments |
|---|---|
| 1950 | $ 59,827.41 |
| 1951 | 134,314.01 |
| 1952 | 308,607.30 |
| 1953 | 283,153.65 |
| 1954 | 481,280.05 |

The average for these five years was $253,436.48.

5. Upon Mr. Goodall's death in October 1953 the partnership necessarily proceeded to liquidate. A partial liquidation was effected on or about May 31, 1954. The estate at that time received 275,000 shares of the corporation's stock and Mrs. Goodall received the remaining 25,000 shares plus other assets. The final liquidation agreement of January 3, 1955, indicated a total value, for liquidation purposes, of $3,090,000 for the 300,000 shares, and values of the shares so distributed to the estate and to Mrs. Goodall at $2,832,500 and $257,500, respectively.

6. Sometime prior to June 1954, five employees made an offer to purchase the corporation's stock for approximately $3,000,000. This offer was accepted. Mrs. Goodall's shares were first redeemed by the corporation for $257,500 and on or about June 2, 1954, the estate transferred its 275,000 shares to the five employees. In order to finance their purchase the employees borrowed $55,000 from a bank and the balance of their purchase price from the corporation. This was made possible by Mrs. Goodall's paying the corporation the full amount of the then balance of the Goodall withdrawals. The employees' indebtedness to the corporation was evidenced by notes secured by the 275,000 shares.

7. Two days later on June 4, 1954, the corporation and the partnership executed a "Lease Agreement". This, following the predecessor "Manufacturing and Rental Agreement" which it obviously replaced, provided for the leasing of the business real estate, machinery and equipment and further provided that the corporation was to pay all expenses of repairs and maintenance, building additions, property taxes, and insurance. It also obligated the corporation to pay the partnership "an amount equal to 3% of the gross sales of all products manufactured on or in said real estate or manufactured by said machinery and equipment". This 3% provision contrasted with the earlier agreement's 5% rate.

The new agreement was to continue from year to year indefinitely but was cancelable on six months' notice. The corporation could not assign the lease without the prior written consent of the partnership.

8. Also on June 4, 1954, the corporation and the partnership executed a separate option agreement. By this the partnership gave the corporation the option to purchase, upon the death of Mrs. Goodall, the leased real estate, machinery and equipment at prices equal to their fair market values on June 1, 1954, less accumulated depreciation. These values were to be determined [presumably by the parties] at a time convenient to the parties.

9. The amount paid under the new agreement for fiscal 1955 was $255,000. This was slightly more than the average payments ($253,436.48) for the preceding five years under the prior agreement but was less than the payment for each of the three immediately preceding years.

10. In the estate tax return the partnership's stock in the corporation was valued at $3,090,000, the machinery and equipment at $41,167, and the real estate used in the business at $136,200. At the trial it was stipulated that the machinery and equipment had a date of death value of $29,800, rather than $41,167 or the much larger figure of $352,388.50 set forth in the 90-day letter.

11. The Commissioner in the 90-day letter made no adjustment in the $3,090,000 valuation of the corporation's stock. Although the estate in its petition for review alleged "that the value of said stock was substantially less than that amount", the Tax Court sustained the figure. This value is not challenged by the estate here.

12. The Commissioner, however, in his 90-day letter and, earlier, in his 30-day letter (as subsequently explained by still another letter and accompanying schedules), increased the value of the estate's interest in the partnership (along with other adjustments) by the addition of a $940,000 item entitled "Intangibles—goodwill". No such item had been included in the estate tax return as filed. The schedules disclose that this $940,000 figure was arrived at by capitalizing (at 20% for a hazardous business) the partnership's excess return, under the Rental Agreement, over what was computed as "fair and allowable rent" on the buildings, machinery and equipment (8% on realty; 12½% on equipment) during the fiscal years 1950/54. A like computation made for fiscal 1955 under the new agreement resulted in a capitalized figure of $1,000,000.

13. The estate in its petition for review alleged that the "partnership had no good will at the time of decedent's death".

The Tax Court in its opinion recited that the estate "has introduced no evidence to show that this adjustment was incorrect"; that the adjustment was one made with respect to a separate partnership asset; that there was no convincing evidence that the good will item "was somehow involved with the valuation of the" corporation's stock; and that the estate had not met its burden of proving that the Commissioner's determination as to the item was in error.

The estate's argument on this issue, as we understand the argument, strikes us as more tactical than substantive. It asserts that at the trial "both parties proceeded on the understanding that this item was a part of the electrical manufacturing business value"; that they introduced their evidence on that basis; that the value of the intangibles was included in the value given to the corporation's stock held by the partnership; that "the Internal Revenue Service has specifically advised petitioner that this adjustment related to the intangible values associated with the manufacturing operation"; and that the Tax Court concedes that the values "were included in the value of the corporation's stock". After the filing of the Tax Court's opinion the estate moved to reconsider and to reopen the proceedings and based that motion on the same grounds. It was stated spe-

cifically that the $940,000 adjustment duplicated values already included in the value of the stock of the corporation. This motion was denied.

The estate asserts that if the Commissioner contends that the good will item is related to some business or asset other than the manufacturing business he should be required to say so and the estate should be given a chance to meet that issue. It argues that this is an appropriate occasion for this court to exercise its jurisdiction to reverse "as justice may require", as provided by § 1141(c) (1) of the 1939 Code [§ 7482(c) of the 1954 Code; see § 7851(a) (6) (C) (iv) of the 1954 Code]. Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037 (1941), and other cases are cited in support of this proposal.

■ We feel that the estate is mistaken when it relates the addition for good will to the manufacturing operation and thus to the corporation. It seems to us that, instead, the good will is related to the lease and its controlling character and thus to the partnership. We feel, further, that the addition is most adequately supported by the Commissioner's arithmetical computation. And it has not been overcome by any evidence presented by the estate. We therefore agree with the Tax Court that the estate has not sustained its burden on this issue.

Neither are we impressed with the argument that the estate in some way was misled by the Commissioner. All the facts were known. The Goodalls were parties to the first agreement and Mrs. Goodall and the estate were parties to the second. The percentage obligation in each lease and the tangible assets covered by it were meticulously described. When the estate, pursuant to its request, was supplied in September 1957, by the Estate and Gift Tax Section of the Service at Omaha, with the details entering into the compilation of the $940,000 figure,

the estate became fully aware of the basis for the inclusion of that item and its separateness from the corporation's stock the value of which was not adjusted. The stock and the good will item were listed individually as assets of the partnership.

Although good will, since the early days of A.R.M. 34, 2 C.B. 31 (1920), has often been an elusive and frequently misunderstood factor, the good will item here does not strike us as an unusual or esoteric one but, instead, as rather typical of a closely held and controlled arrangement such as the corporation-partnership dealings here. The good will in controversy did not go along with the stock of the corporation when it was sold to the five employees. It is true that what good will may have existed in the corporation's operation went along. But what we are concerned with here are the lease rentals which flowed to the partnership under the agreements. It is there where the good will, which is now in contest, emerges over and above, and separate from, the value placed upon the corporation's stock corresponding essentially with its sale price to the five employees. Certainly, the partnership's right to receive a percentage of the corporation's gross sales was something apart and distinct from the stock. And when the value of that right exceeds a fair rental of the tangible assets leased, it is an asset which exists and is includable in the gross estate.

It is of particular significance, we think, to note that the rental paid during only the first fiscal year under the new lease was already one and a half times the value of the tangible properties rented. This is a 150% return in one year [7] and clearly indicates the existence of good will owned by the partnership as an independent asset.

We might further observe that, in our uninformed estimation, the Service's computation of the $940,000 value seems to be one which was really advantageous to

---

7. On the returned values the figure is 144%; on the stipulated values of machinery and equipment the figure is 153%.

the estate. It was given the benefit of a hazardous business capitalization percentage and it was given the further benefit of a 12½% return on tangible personalty valued at the 90-day letter's figure of $352,388.50. But this latter figure at trial was reduced by stipulation all the way down to $29,800. The former factor, in view of several years' experience, could perhaps be regarded as somewhat generous; the latter factor is rendered grossly excessive by the stipulation. The compilation on the whole, therefore, strikes us as most reasonable.

This issue must also be decided against the estate.

V. The first corporation issue. Does the record support the Tax Court's finding that, in each of its fiscal years 1950/54, inclusive, the corporation permitted its earnings and profits to accumulate beyond the reasonable needs of its business, within the meaning of § 102(c) of the 1939 Code?

We have recited above that the corporation assumed its present name in 1949; that it entered into the Manufacturing and Rental Agreement with the partnership in May of that year; and that under that agreement it took over the manufacturing business theretofore conducted by the partnership.

During each of the five fiscal years in question the corporation's capacitor sales amounted to more than 90% of its total sales. The corporation itself did not have a contract with the Navy but it supplied capacitors to firms which possessed such contracts. It had five customers. The principal one was Eastman Kodak. Its gross sales of capacitors, its returned gross sales, and its returned taxable income were:

| Fiscal Year Ended May 31 | Gross Sales of Capacitors | Total Gross Sales | Returned Taxable Income |
|---|---|---|---|
| 1950 | $1,080,734.54 | $1,185,689.54 | $ 323,366.13 |
| 1951 | 2,474,708.18 | 2,686,280.23 | 754,934.46 |
| 1952 | 5,761,401.22 | 6,200,690.79 | 2,118,545.45 |
| 1953 | 5,280,247.13 | 5,663,073.05 | 1,458,268.97 |
| 1954 | 8,841,906.74 | 9,629,976.14 | 3,405,106.25 |

The balance sheets set forth in the returns filed by the corporation showed the following amounts of cash and earned surplus and undivided profits:

| Fiscal Year Ended May 31 | Cash | Earned Surplus and Undivided Profits |
|---|---|---|
| 1950 | $ 515,940.38 | $ 323,366.13 |
| 1951 | 685,997.36 | 955,421.46 |
| 1952 | 2,269,514.88 | 1,138,748.37 |
| 1953 | 1,619,636.41 | 1,581,729.06 |
| 1954 | 3,198,585.98 | 2,528,642.29 |

No dividends were declared by the corporation during the five fiscal years. During these years, however, the Goodalls repeatedly withdrew corporate funds.

They also made some repayments. Most of these withdrawals were utilized in partnership oil activities. The year-end balances of the withdrawals, as shown in the returns for 1950/53 and described therein as amounts due from officers, were:

| Fiscal Year Ended May 31 | Balance |
|---|---|
| 1950 | $203,043.48 |
| 1951 | 273,152.58 |
| 1952 | 309,696.15 |
| 1953 | 880,273.20 |

At May 31, 1954, the balance was approximately $1,660,000; $1,318,088.74 of this amount had been withdrawn for use in the oil ventures.

During this five year period the corporation was engaged in meeting technical problems in the reduction of the size and cost of capacitors and in designing a satisfactory enclosure for them.

In May 1961 the Commissioner notified the corporation, pursuant to § 534(b) of the 1954 Code,[8] that he proposed to issue for fiscal 1950/54 the statutory notice of deficiency in tax imposed by § 531 [§ 102(a) of the 1939 Code]. The corporation, as permitted by § 534(c), thereupon, by letter dated June 19, 1961, submitted its statement of the grounds on which it was relying to establish that its earnings and profits had not been permitted to accumulate beyond the reasonable needs of its business and thereby purported, under § 534(a) (2), to place the burden of this issue on the Commissioner. The grounds so stated were:

1. The need "to provide for the very large and undetermined liabilities to the United States Government for renegotiation of war contracts and for income and excess profits taxes and for the operational needs of the business".

2. The need "for the contemplated expansion of the business into other fields, the acquisition of other companies and businesses, and for the planned construction of factories in other countries".

3. The need "to provide against losses and costs of changing to different fields of manufacturing, to offset losses incident to termination of military contracts, and to supply the funds to obtain the necessary plant and equipment for the manufacture of civilian items, and to finance the development of a market therefor".

With its engagement in the manufacture of capacitors for Navy use, the corporation was subject to renegotiation under the Renegotiation Act of 1951 (see 50 U.S.C. App. § 1191). In March 1952 the Renegotiation Board notified the corporation that fiscal 1950 was being considered. In the following July it notified the corporation that it was commencing renegotiation proceedings for that year. No liability, however, was determined for fiscal 1950. In November 1954 the Board made a tentative determination of liability for fiscal 1951. Renegotiation as to that year was concluded in April 1955. Also, in that month, a notice of tentative determination was given for fiscal 1952; a final determination for 1952 was made by the Board in February 1956 and concluded in the ensuing fall. Preliminary notices of liability for fiscal 1953/54 were given in March and May 1959, respectively, were finally determined that August, and were concluded in November 1959. The total of the tentative deter-

---

8. Section 534 of the 1954 Code has no counterpart in the 1939 Code. Section 534(e), however, now makes § 534 applicable to the corporation's fiscal years 1950/54.

minations for the five years was $1,500,-900. The corporation's ultimately required repayments, net after credits under § 3806(b) of the 1939 Code, were:

| Fiscal Year Ended May 31 | Reduction in Net Income | Net Repayment After Credit under § 3806(b) of the 1939 Code |
|---|---|---|
| 1951 | $ 275,000 | $ 56,632.36 |
| 1952 | 1,200,000 | 360,000.00 |
| 1953 | 550,000 | 150,012.66 |
| 1954 | 1,100,000 | 411,912.33 |
| | $3,125,000 | $978,557.35 |

One readily sympathizes with the business problems of a corporation such as this one during the hectic years of the Korean War. Its business was concentrated in capacitor production. Even that aspect of its activity was largely confined to one customer. Orders were subject to cancellation and some were cancelled. There were pressing and seemingly constant problems as to size, storage, construction, production, and costs of capacitors. Mr. Goodall's death was a most jarring event. There were competitive problems, too, and demand showed signs of volatility. Maintaining the corporation's share of the market depended upon ability to keep up with new developments, to deliver promptly, and to comply with changes required by the Navy.

The company, as any competent manufacturer then engaged in government work would be, was aware of its renegotiation obligations and of the possible and seemingly inevitable result of renegotiation. It filed its contractor's reports with the Renegotiation Board. A conference with board representatives was held at Ogallala in the summer of 1952. And Mr. Goodall, in the first half of 1953, traveled to Europe and to Mexico to investigate the possibility of locating plants there for civilian use manufacture. A Mexican corporation had even been organized and a bank account opened in that country.

The Tax Court, however, decided the unreasonable accumulation issue against the taxpayer corporation. The court expressed doubt whether the facts set forth by the corporation in its responsive statement under § 534(c) were "sufficient to support the listed grounds" but went on to hold that even if it assumed that the burden of proof was on the Commissioner, he had successfully met that burden.

The Tax Court emphasized the absence of declaration of any dividends during the entire five year period; the increase in earned surplus and undivided profits from zero to more than two an a half million dollars; the Goodalls' complete control; their continuous withdrawal of corporate funds for their own or partnership purposes; the growth of these withdrawals to more than $1,600,000 by May 31, 1954; and the use of most of the withdrawals for the oil operations and thus "for purely personal expenditures or for other ventures of the Goodalls". The court observed, "Such continual use of the corporate funds strongly indicates, in our opinion, that its earnings and profits to this extent were not needed in the operation of the corporation's business and that such amounts were accumulated beyond its reasonable needs within the meaning of the statute".

The court then examined the grounds stated by the corporation in justification of the accumulation. It concluded that none of them had merit. It was not convinced by the purported expansion plans because the trips Mr. Goodall made in 1953 were no more than exploratory; there was no showing that earnings accumulated in prior years were insuffi-

cient for this purpose; there was no showing that such expansion plans were contemplated formally; and any such plans evaporated when the decedent died in October 1953, seven months prior to the end of fiscal 1954. The court dismissed the factor of potential renegotiation liability because it was not until July 1952 (which was in fiscal 1953) that the corporation was first informed that fiscal 1950 was to be renegotiated; it was not until November 1954 (after the five fiscal years here involved) that the corporation was notified of a tentative determination for fiscal 1951; and management was not sufficiently concerned about these liabilities to establish a reserve for them. The court was not persuaded by the factor of income and excess profits tax liability because the Commissioner did not begin his audit of the fiscal years in question until September 1953, during the last of the fiscal years here involved, and the agent's report was not completed until some years later. Neither was the court convinced by the factor of need for operations because the corporation's cash account throughout the entire period was substantial and, when viewed against the background of constant withdrawals, indicated that the accumulation was not to meet operational needs. It also touched upon the favorable working capital position, the nature of the current assets, and the sales pattern. Lastly, the court was not impressed with the claimed hazardous nature of the business. It noted that no reserves for this contingency had been set up; that there was no real indication that management was concerned about the hazard; that sales rose substantially during the period; that the sales pattern was generally upward; and that sales exceeded $9,000,000, not only in fiscal 1954 but also in the two succeeding fiscal years after the corporation had been sold.

The corporation first attacks the decision of the Tax Court by arguing (1) that there can be no § 102 surtax unless earnings and profits were accumulated beyond the reasonable needs of the business because, it says, this is the issue narrowly framed by the 90-day letter; (2) that, because of the filing of the § 534(c) statement, the Commissioner has the burden of proof; (3) that the court must find facts as to the corporation's earnings and profits and as to its reasonable business needs; and (4) that it failed to make a finding as to either of these essential facts.

Although we are inclined to share the Tax Court's concern about the legal sufficiency of the § 534(c) statement (under the statute's specification of "facts sufficient to show the basis thereof"), we are willing to assume, for purposes of this review, but without deciding, the first three of these four propositions advanced by the corporation. See American Metal Prod. Corp. v. Commissioner of Internal Revenue, 287 F.2d 860, 861 (8 Cir. 1961). Having done this, we are not persuaded that the Tax Court failed to make findings as to earnings and profits and reasonable business needs. On the contrary, it did find specifically what the corporation's records showed as to earned surplus and undivided profits at the end of each of the five fiscal years. It did find the amounts in the cash account on the same dates. It did find corporate inactivity as to that cash. And it did find that, to the extent of the withdrawals, earnings and profits "were not needed in the operation of the corporation's business and * * * such amounts were accumulated beyond its reasonable needs".

The heart of this preliminary argument by the corporation, however, seems to be that actual tax and renegotiation liabilities clearly enter, under § 102(d), into the determination of what is "section 102 net income" and therefore must first be provided for before a corporation can be said to have any earnings or profits, citing W. S. Farish & Co., 38 B.T.A. 150, 156, 159 (1938), aff'd Commissioner of Internal Revenue v. W. S. Farish & Co., 104 F.2d 833 (5 Cir. 1939), cert. denied Blaffer v. Commissioner of Internal Revenue, 308 U.S. 559, 60 S.Ct. 91, 84 L. Ed. 469, and that a taxpayer's "mental attitude toward them is wholly immaterial".

■ We are not prepared to hold that there must be a finding of specific monetary amount for the reasonable needs of the business before, and as a condition of, a finding that there has been an accumulation of earnings beyond reasonable business needs. The latter may clearly appear without a dollar and cents determination of the former. And it would not make good tax law to hold, as we think is the ultimate implication of the corporation's argument, that there may be unlimited accumulation so long as the possibility of further tax or renegotiation liability exists and is undetermined. We see nothing of meritorious substance, therefore, in the argument that the Tax Court failed to find facts essential for a decision.

This takes us to the real issue under § 102, namely, whether the court's decision finds adequate support in the record.

■ The governing legal principles are established. The purpose of the surtax, of course, is to compel a corporation to distribute profits not needed for its business and to prevent its being used as a shield against the income tax on the shareholders. Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699, 63 S.Ct. 843, 87 L.Ed. 1086 (1943). Where the question of tax liability centers on an accumulation of earnings and profits "beyond the reasonable needs of the business", the issue is essentially one of fact. Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, 253 F.2d 121, 124 (8 Cir. 1958); American Metal Prod. Corp. v. Commissioner of Internal Revenue, supra, p. 864 of 287 F.2d. Consequently, the Tax Court determination is conclusive if supported by substantial evidence. Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346 (1938); American Metal Prod. Corp. v. Commissioner of Internal Revenue, supra; Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, supra; Hedberg-Freidheim Contracting Co. v. Commissioner of Internal Revenue, 251 F.2d 839, 842 (8 Cir. 1958).

In American Metal Prod. Corp. v. Commissioner of Internal Revenue, supra, p. 863 of 287 F.2d, we noted that "while the ultimate determination concerns the presence of a purpose to avoid income tax upon shareholders, the real controversy, as perhaps is the situation in most cases of this type, concerns the presence or absence of a valid business reason for accumulating earnings".

Section 537 of the 1954 Code defines the term "reasonable needs of the business" to include "the reasonably anticipated needs of the business". This had no counterpart in the 1939 Code. Accordingly, where, as here, we are concerned with tax years governed by the 1939 Code, the factfinder was not particularly obliged to consider anticipated needs in its determination of reasonable needs. This court, in Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, supra, pp. 123–24 of 253 F.2d., noted this distinction between the two Codes and participated in the so-called "immediacy doctrine". 7 Mertens, Law of Federal Income Taxation, § 39.50 (1967). In considering the 1939 Code we, through Judge Johnsen, spoke of "a practical and objective basis" and "immediacy of need" which "does not go farther than direct and present apparency", and which does not "reach to visionary hopes or ambitions, nor does it compel blind acceptance of marked sweeps from previous rudder course".

The corporation, in claiming that the Tax Court decision on the § 102 issue is not supported by the evidence, argues that the figures, if the court had only set them down, disclose that the corporation was actually suffering from a capital deficiency and therefore cannot appropriately be accused of excessive accumulation of earnings, and that this is so wholly apart from its needs for plant expansion, the Commissioner's tax demands, interest thereon, renegotiation liability, and required protection from the hazardous and changing nature of the business. It would then demonstrate, by an elaborate table, its needs for additional capital over and beyond the originally contributed

plus earnings, and without taking into account the pending demands just enumerated. It goes on and asserts that the renegotiation and tax liabilities are necessarily deductible in arriving at actual earnings and are business needs irrespective of whether they prompted the accumulations.

The weakness of the corporation's fiscal table and ensuing argument lies, we think, in its being based on events and developments of days long subsequent to the five year period at issue. The compilation rests on claimed working capital requirements of substantial size, on the Tax Court's 1965 decision herein, and on the Rule 50 results. The capital requirements are those developed by a Peat, Marwick partner who testified that he first did work for the Goodalls in late 1956 and developed his figures, on a 90-day turnover basis, just prior to trial. He conceded this to be "a judgment factor".

Our governing standard is whether earnings were permitted to accumulate beyond the reasonable needs of the business focused, as Judge Johnsen said in Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, supra, on "a practical and objective basis" and on "immediacy of need". We do not mean to imply that liabilities currently incurred but presently indefinite and to be fixed only in the future, may not be taken into account in exercising the business judgment whether to accumulate or to disburse, or to do a bit of both. That, of course, is a decision a businessman makes almost daily. But there must be, particularly under the 1939 Code and, we suspect, even under § 537 of the 1954 Code, a realistic reasonableness of action before the shoals of § 102 are to be successfully avoided. Dixie, Inc. v. Commissioner of Internal Revenue, 277 F.2d 526, 528 (2 Cir. 1960); 7 Mertens, Law of Federal Income Taxation, § 39.32 (1967). We find this realism absent here.

The following lend adequate support to the finding of the Tax Court: (1) As of the end of fiscal 1953 the corporation possessed cash in the amount of $1,619,636.41 and, in addition, amounts due from officers (the withdrawals by the Goodalls) of $880,273.20. (2) At the end of fiscal 1954 it had $3,198,585.98 in cash (the return makes no specific reference to amounts then due from officers). (3) These figures had grown from a beginning cash figure on June 1, 1949 of $387,806.86. (4) The corporation was wholly owned by the partnership and was completely controlled by the Goodalls. (5) Funds of the corporation were regularly loaned to the officers-shareholders-partners and reached very substantial totals. (6) Substantial portions of the funds so advanced were utilized and activated not for corporation-related matters but for unrelated ventures of the partnership and other personal uses of the Goodalls. (7) The balance sheet ratios of current assets to current liabilities was consistently very favorable. (8) The corporation appeared always to be in an enviable liquid position. (9) No reserves were established for renegotiation liability. (10) No dividends were declared. (11) No corporate meetings were held until after Mr. Goodall's death. (12) Substantial tax savings to the Goodalls were possible through accumulation. (13) The suggested expansion plans were never brought to fruition and progressed to no more than the investigational stage. (14) The corporation performed comparatively little research. (15) The audit of its income tax returns was not begun until September 1953, in the last year of the five year period, and the Revenue Agent did not complete his work until some years later. (16) The first notice of preliminary consideration from the Renegotiation Board came in March 1952 and concerned fiscal 1950 but resulted in no renegotiation liability. (17) The earliest notice of a tentative determination of liability for a year when liability was ultimately established came only in November 1954, after the close of the five fiscal years. (18) Renegotiation was concluded for fiscal 1951 only in April 1955, for fiscal 1952 only in the fall of 1956, and for fiscal 1953/54 only in No-

vember 1959. (19) The net repayments totalled less than a million dollars. (20) The Board, by the concluding agreement, permitted the repayments for fiscal 1953/54 to be spread over fiscal years 1960/64, and thus for as long as ten years after the period. (21) This period of time embraced several years the profits of which were available to meet the obligation. (22) There is nothing in the record which discloses a disturbed concern on the Goodall's part, during the five years, about liabilities for renegotiation and tax deficiencies or even about the asserted capital needs requirements which the retained accountant developed later for the Tax Court trial and which were based on his good judgment and experience. (23) Actual working capital needs appear to have been well taken care of by cash flow.

█ There are, of course, possible explanations for some of these factors (the informality of record keeping, the absence of outside ownership interests, fiscal 1954's returned income tax liability of $2,124,327.81, and the like). But on a review of evidentiary sufficiency, the record is examined in the light most favorable to the party prevailing below. And we deal again with the Tax Court's "experience with the mainsprings of human conduct to the totality of the facts". Commissioner of Internal Revenue v. Duberstein, supra, p. 289 of 363 U.S., p. 1198 of 80 S.Ct.

The decided cases are supportive. One or more of these same factual elements, sometimes several in combination, are present and relied upon, for example, in the following: Helvering v. National Grocery Co., supra, 304 U.S. 282, 292–294, 58 S.Ct. 932, 938 (1938) (excess of cash over payables; tax savings; loans to the sole shareholder; "no conceivable expansion could have utilized so large a surplus"); Helvering v. Chicago Stock Yards Co., supra, 318 U.S. 693, 701, 63 S.Ct. 843 (1943) (the availability of accumulated earnings for the investment purpose and program of the sole shareholder; tax savings); American Metal

Prod. Corp. v. Commissioner of Internal Revenue, supra, 287 F.2d 860, 863–865 (8 Cir. 1961) (failure to carry out program for enlarged accounts receivable and plant expansion; full control; possible tax savings; extreme liquidity; favorable ratio of current assets to liabilities; very small dividends); Kerr-Cochran, Inc. v. Commissioner of Internal Revenue, supra, 253 F.2d 121, 125–128 (8 Cir. 1958) (loans to shareholders; use of earnings to buy investment property not related to regular business; favorable ratio between current assets and current liabilities; absence of extension of credit causing a freezing of working funds; tax saving); Bride v. Commissioner of Internal Revenue, 224 F.2d 39, 41–42 (8 Cir. 1955), cert. denied 350 U.S. 883, 76 S.Ct. 136, 100 L.Ed. 779 (absence of an objective which demanded an accumulation in a reasonably definite amount; possible tax savings); J. Gordon Turnbull, Inc. v. Commissioner of Internal Revenue, 373 F.2d 87 (5 Cir. 1967), cert. denied 389 U.S. 842, 88 S.Ct. 72, 19 L.Ed.2d 105, affirming 41 T.C. 358, 374 (1963) (favorable current asset-liability ratios; small ultimate tort liability as compared with amount originally asserted; use of funds to purchase own stock); Oyster Shell Prod. Corp. v. Commissioner of Internal Revenue, 313 F.2d 449 (2 Cir. 1963) (substantial withdrawals; absence of interest charge or note; investments by the shareholders); Henry Van Hummell, Inc. v. Commissioner of Internal Revenue, 364 F.2d 746, 751 (10 Cir. 1966), cert. denied 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 102 (absence of demonstration of taxpayer's intent through contemporaneous course of conduct; adoption of no plan). See Treas. Regs. § 1.533–1(a) (2); 7 Mertens, Law of Federal Income Taxation, §§ 39.34 and .49; Luria, The Accumulated Earnings Tax, 76 Yale L.J. 793 (1967).

In Smoot Sand & Gravel Corp. v. Commissioner of Internal Revenue, 241 F.2d 197, 202 (4 Cir. 1957), cert. denied 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed.2d 1437,

the court referred to expansion plans and intent. It said,

"The intention claimed must be manifested by some contemporaneous course of conduct directed toward the claimed purpose. \* \* \* Here the petitioner failed to show that it had during the period \* \* \* any definite plan for future replacement and expansion out of reserves."

We affirm the Tax Court on this issue.

VI. The second corporation issue. Does the record support the Tax Court's finding that, in each of its fiscal years 1950/54, inclusive, the corporation was availed of for the purpose of preventing the imposition of surtax upon its shareholders, within the meaning of § 102(a)?

Having concluded that earnings and profits were permitted to accumulate beyond the reasonable needs of the corporation's business, the Tax Court then considered the question whether the purpose of the accumulation was to avoid surtax upon shareholders. It concluded that the corporation had not met its burden of proof in this respect.

Under § 533(a) of the 1954 Code the fact, once established, that earnings and profits have been permitted to accumulate beyond the reasonable needs of the business is determinative of the purpose to avoid income tax with respect to shareholders unless the corporation "by the preponderance of the evidence shall prove to the contrary". In the corresponding § 102(c) of the 1939 Code, which governs here, the standard was "the clear preponderance of the evidence". We are confronted, therefore, with what appears to be a stricter statutory presumption and standard of proof under the 1939 Code. This burden as to purpose is evidently on the corporation rather than on the Commissioner. Pelton Steel Casting Co., 28 T.C. 153, 183 (1957), aff'd Pelton Steel Casting Co. v. Commissioner of Internal Revenue, 251 F.2d 278 (7 Cir. 1958), cert. denied 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed. 2d 1066.

Here, again, we have no difficulty in going along with the Tax Court's finding and we conclude that it, too, is adequately supported by the record. This support is afforded by many of the same factors listed above and by others: (1) The Goodalls' own high income brackets. (2) The tax advantage to be gained by an absence or minimization of corporate distributions. (3) The Goodalls' complete dominance and control. (4) Their constant and growing withdrawal of corporate funds for personal expenses and ventures, some highly speculative, unrelated to the corporation. (5) The year-end calculation of the difference between rents and salaries owing to the Goodalls and the withdrawals actually made, and denominating that difference as a loan without other formality or exercise of business judgment as to amount or as to the advisability of distribution. (6) The ability to repay. (7) The eventual repayment, after Mr. Goodall's death, of the balance of the withdrawals just when the sale to the five employees and their $3,000,000 borrowing required it. (8) The low ratio of reasonably projected liability to available funds. In addition to these factors there is the statutory presumption of § 102(c).

We are satisfied that the finding as to purpose is a proper one and, indeed, that not only the preponderance of the evidence but the clear preponderance of it did not overcome but fully supported the statutory presumption.

VII. The third corporation issue. Did the Tax Court err in its compilation of the § 102 surtax?

This issue breaks down into two sub-issues: (A) Are federal income and excess profits taxes, which were also in controversy in the proceedings in the Tax Court, a proper deduction in the computation of section 102 net income? (B) In determining basic surtax credit, is the corporation entitled to a dividends paid addition for certain withdrawal items?

A. The surtax imposed by § 102(a) is computed by percentages of "undistributed section 102 net income".

In turn, "section 102 net income" is defined by § 102(d) (1) to mean the net income (adjusted for two factors of no consequence here) minus the sum of certain taxes and other items therein described. The taxes are, by § 102(d) (1) (A), "Federal income * * * and excess-profits taxes * * * paid or accrued during the taxable year, to the extent not allowed as a deduction by section 23, but not including the tax imposed by this section * * *." Section 23(c) (1) (A) denies a deduction for federal income taxes in the computation of net income. Consequently, such taxes, denied under § 23, are allowed in computing "section 102 net income". The purpose, of course, is to arrive at a realistic determination of improper accumulation and what a corporation has properly paid or accrued for federal income taxes reduces the accumulation accordingly.

As to this generality there is no argument. The controversy here centers on what may be regarded as federal income taxes of the corporation properly "paid or accrued during the taxable year". The Commissioner's 90-day letter, dated September 27, 1961, to the corporation determined deficiencies in the corporation's normal tax and surtax (as well as in § 102 surtax). Because it kept its books and filed its returns on the accrual basis, the corporation here asserts that these deficiencies, to the extent they have been upheld in the present Tax Court proceedings (that is, its "actual liability"), are deductions in the determination of what is section 102 net income. The corporation thus wants a deduction for the additional taxes (other than the § 102 surtaxes) contested in this litigation.

We think the point is controlled by Dixie Pine Products Co. v. Commissioner of Internal Revenue, 320 U.S. 516, 64 S. Ct. 364, 88 L.Ed. 270 (1944). There an accrual basis taxpayer contested a state tax. The Court said, p. 519, p. 365 of 64 S.Ct., applying what it has called the "all events test":

"It has never been questioned that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. * * * It must, in the circumstances, await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated." [footnotes omitted].

To like effect are Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725 (1944), and United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356 (1961). See S.Rep. 1622, 83d Cong.2d Sess., p. 320, 3 U.S. Code Congressional & Administrative News (1954), pp. 4621, 4960–61, where it was said, with respect to undistributed personal holding company income, "In the case of contested taxes the accrual occurs in the year the contest is resolved", and Mills, Inc. v. Commissioner of Internal Revenue, 250 F.2d 55 (1 Cir. 1957).

Our case of Birmingham v. Loetscher Co., 188 F.2d 78 (8 Cir. 1951), and others cited by the corporation, are not contrary holdings. In *Birmingham* we held merely that a cash basis personal holding company taxpayer could deduct, under the applicable statute, an uncontested surtax in the year in which it accrued. The statute, § 505(a) (1) of the 1939 Code, was, for all essential purposes, the same as § 102(d) (1) (A). But that holding was merely in line with accepted principles applied in the light of the particular statute. The taxes claimed to be deductible were not in contest.

We sustain the Commissioner as to this sub-issue.

B. "Undistributed section 102 net income", on which the surtax of § 102(a) is imposed, is defined by § 102(d) (2) to mean "the section 102 net income minus the basic surtax credit provided in section 27(b) * * *." In the computation of the basic surtax credit under § 27(b), dividends paid during the taxable year are an includable component but § 27(h) requires, for this result, that the distribution be pro rata.

This issue centers on certain withdrawals by the Goodalls from the corporation, namely, (a) those stipulated to be excess salary paid to Mrs. Goodall, and (b) those stipulated as "unrecorded withdrawals". The Tax Court held that these obviously were not made pro rata and thus did not qualify as dividends paid.

 We conclude, however, that the partnership agreement, the legal efficacy of which is now accepted by the Commissioner, supra, controls here. It provides that Mr. and Mrs. Goodall share equally and are equally liable. Their salaries were partnership income and these and the other withdrawals were taxed to the partners through the partnership, in accord with the partnership agreement and § 182(c). Further, the partnership was the sole shareholder. All this determines and fixes the rights as between the Goodalls. The items are necessarily pro rata; they cannot be otherwise.

We sustain the corporation as to this sub-issue.

VIII. The first individual issue. Did the Tax Court err in disallowing the expensing of intangible drilling and development costs? This issue arises in connection with the partnership returns and affects the income taxes of the Goodalls for 1950/53, of the estate for 1953/54, and of Mrs. Goodall for 1954.

The partnership return for calendar 1949 is crucial. It contained, among its list of "Expenses" for "Other operations", an item of $3,646.50 described only as "Oil leases". It asserted no deduction for depletion. The 1950 return contained an expensed item of $3,112.60

for "Intangible drilling costs". A like item, but for far greater amounts, appeared in subsequent partnership returns. No amended 1949 return was filed. It is conceded now that the "Oil leases" item of $3,646.40 in the 1949 return was not an intangible drilling or development cost.

We look first at the law and the applicable regulations and then at the other facts which possess possible pertinency.

Section 23(a) (1) (A) of the 1939 Code allows as deductions the ordinary and necessary expenses of a trade or business and § 23(a) (2) permits individuals to deduct all ordinary and necessary expenses paid or incurred for the production or collection of income. Section 23(m) grants a deduction, for oil and gas wells, of "a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner".

Treas. Regs. 111 prescribes the rule here for calendar 1949/51. Section 29.23 (m)–16(b), applicable to taxable years beginning after December 31, 1942, gives the taxpayer, who has an operating oil interest in fee or by lease, the option either to capitalize (and then deplete or depreciate) or to expense intangible drilling and development costs of the kind therein described. It provides:

"(4) Subsection (b) of this section grants a new option with respect to intangible drilling and development costs incurred by an operator in a taxable year beginning after December 31, 1942, in the development of oil and gas properties, and requires a new election under such option. Any operator who incurs such costs must make a clear statement of election under his option in the return for the first taxable year beginning after December 31, 1942, in which such costs are incurred. The absence of a clear indication in such return of an election to deduct as expenses intangible drilling and development costs shall

be deemed to be an election to recover such costs through depletion to the extent that they are not represented by physical property, and through depreciation to the extent that they are represented by physical property. This election is binding for all subsequent years."

Similar provisions, but with some changes, appear in Treas. Regs. 118 § 39.23 (m)–16(a) (1) and (d), applicable to 1952/53 and in the current Treas. Regs. § 1.612–4(a) and (d), applicable to 1954. See § 263(c) of the 1954 Code.

In September 1949 C. A. Black, for an expressed consideration of one dollar, conveyed to the partnership a quarter interest in a property known as the Winters Lease. Black mailed the assignment to Mr. Goodall with a letter in which he said:

"Enclosed herewith please find your assignment for 1/4 interest in the Winters Lease for well to be drilled to the top of the Arbuckle pay zone with cable tools at a cost to you of $3,-500.00 provided the well is a dry hole. If the well is a producer you pay your 1/4 for necessary casing and equipment to produce same.

"Also enclosed please find Operating Agreement which I wish you would please sign and have notarized and attested and return with your check for $3500.00 made out to the writer."

Goodall signed and returned the operating agreement with a letter on corporation stationery, and signed by him as its president, stating:

"Enclosed are four checks to cover the $3,500.00 which covers our share of the cost of drilling as per the contract.

"In order to make this perfectly clear to the Income Tax Collectors, I have made this in the form of four checks dated one week apart; the four checks to represent the supposedly weekly cost of our share of the drilling operation. By handling it in this manner we can set it up as an operating expense."

The checks were corporation checks. Three were for $900 each and the fourth for $800. The voucher for each described the expense as "drilling".

The operating agreement provided in part:

"It is further agreed between the parties hereto that all expenses incurred in future drilling operations and all production and operating expense including the purchase of materials and supplies for said leasehold shall be paid for by the parties hereto and their successors in interest rateably in proportion to their ownership therein."

The payments represented by the checks were not reflected in the partnership return for 1949 either as expenses or as capital items. Having been made by the corporation, they were charged to its account against the partnership.

Mr. Black testified that during the drilling of the well on the Winters Lease he, pursuant to the operating agreement, submitted to Mr. Goodall various invoices for costs and share thereof allocated to the Goodall quarter interest. These covered a large number of items, including a geologist's fee and costs for equipment rental, building a platform, cementing the casing, delivery, and moving. The Goodall shares of most, if not all, of these costs were paid in 1949. This was in addition to the $3500 payment.

There is no dispute (1) as to the amount of the costs in issue; (2) that they were incurred by the partnership in contrast to the Goodalls as individuals; (3) that the option, accordingly, is one exercisable by the partnership and not by the individuals; and (4) that the partnership election is controlling irrespective of any election made by the individuals with respect to their independent operations. Bentex Oil Corp., 20 T.C. 565 (1953), petition for review dismissed on parties' stipulation for settlement, 55–1 U.S.T.C. par. 9208 (5 Cir. 1955); Rev.Rul. 54–42, 1954–1 C.B. 64; § 703 (b) of the 1954 Code; Treas. Regs. § 1.703–1(b).

The Tax Court found that the Goodall partnership had incurred intangible drilling costs in 1949 and had made no elec-

tion to expense such costs in its 1949 return. It held that costs of that kind incurred in the years at issue were therefore not deductible as expenses but must be capitalized and subjected to depletion. The taxpayers take issue with these findings and conclusions.

■■■ A. The taxpayers contend that the first issue is whether the $3500 payment was for drilling costs or was for the quarter interest in the Winters Lease. They strenuously urge the latter and rely on Sidney Platt, 18 T.C. 1229, 1232–33 (1952), aff'd Platt v. Commissioner of Internal Revenue, 207 F.2d 697 (7 Cir. 1953).

Even if we were confined factually to the $3500, we would be inclined to reject the taxpayers' argument and conclude that *Platt* is to be distinguished. Mr. Goodall's characterization by letter of his arrangement with Black, the check voucher descriptions, the language of the operating agreement, and Black's testimony that the $3500 payment was "partly for drilling cost" would support the Tax Court's conclusion. But, in any event, the $3500 does not stand alone and we need not determine its nature. The invoice charges by Black to the Goodalls in 1949 force the conclusion that intangible drilling costs were incurred and paid by the partnership in that year. The taxpayers would set these charges and their payment aside on the ground that they were operational and not intangible drilling costs. It is clear, however, that they embrace items of the kind which come clearly within the definition of intangible, non-salvage value, drilling and development costs which is contained in Treas. Regs. 111 § 29.23(m)–16(b) (1) (i). The Tax Court's finding that such costs were incurred by the partnership in 1949 must stand.

B. The taxpayers next contend that, assuming intangible drilling costs were incurred in 1949, a proper election to expense items of that type was in fact made for that year. They point to the oil lease expense in the 1949 return and to the item, consistently treated, in the

partnership return for 1950. They stress that no costs of this kind were ever capitalized either on the partnership books or on its returns but were always expensed; that the accountant who prepared the 1949 return examined the manufacturing records only up to June 1 of that year, and, accordingly, overlooked and failed to pick up the item for deduction on the return; that the omission was due only to a strange combination of ameliorating circumstances; that the purpose of the regulation has been fulfilled; that its "clear statement" and "clear indication" language is directory and not mandatory; that the deduction is allowable, even though not asserted in the return, if a decision to expense was actually made; that Mr. Goodall made that decision; that the issue comes down not to the question whether an election was made but whether it was made in proper form; and that the Tax Court has exalted form over substance.

Both sides refer to the same cases. We feel, however, that the decided cases are not precisely or ultimately supportive of either side. Some concern earlier regulations which contain language less positive and specific.

Relief has been denied to taxpayers in cases where the facts can be distinguished: Boone County Coal Corp. v. United States, 121 F.2d 988 (4 Cir. 1941) (costs capitalized on the books and also on the first return; books later changed at direction of officers and approved by directors; dictum, p. 992, that the taxpayer could have changed its election by a timely amended return); Commissioner of Internal Revenue v. Titus Oil & Inv. Co., 132 F.2d 969 (10 Cir. 1943) (attachment to return of balance sheet showing costs as an asset held to constitute an election to capitalize; election could not be changed by an untimely filed amended return; the schedule "indicates a purpose on the part of the taxpayer"); Burford Oil Co. v. Commissioner of Internal Revenue, 153 F.2d 745 (5 Cir. 1946) (1939 return filed without proper signature and with no election; amended return filed in 1941 claimed deduction for drilling

costs; held this election should have been made in the first return); California Coast Oil Co., 25 B.T.A. 902 (1932) (costs capitalized on books, on return, and on amended return; claim of mistake not accepted). See J. E. Riley Inv. Co. v. Commissioner of Internal Revenue, 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940) (failure to elect percentage depletion).

Relief has been granted in other cases where the facts also can be distinguished: Commissioner of Internal Revenue v. Sklar Oil Co., 134 F.2d 221 (5 Cir. 1943) (1933 costs of one lease expensed only in 1934; 1933 costs of other lease partly expensed and, contrary to instructions, partly capitalized; held that the applicable regulation was sufficiently complied with); Sterling Oil & Gas Co. v. Lucas, 51 F.2d 413 (W.D.Ky.1931), aff'd 62 F.2d 951 (6 Cir. 1933) (costs capitalized in 1919 no-tax return; in amended return disclosing additional income costs were expensed on order of officers and directors; held an election "implies a deliberate choice" and the choice was not made until the board action); Hawkeye Petroleum Corp., 18 T.C. 1223 (1952), petition for review dismissed on stipulation of parties, Commissioner of Internal Revenue v. Hawkeye Petroleum Corp., 205 F.2d 957 (8 Cir. 1953) (taxpayer's only 1944 operation was a dry hole; with this peculiar fact the majority held that failure to give a clear indication in that return to expense did not equate with an election to capitalize and election could be made in later year; one judge, concurring, placed emphasis on expensing in the books and said, p. 1228, "The regulations should not be construed so narrowly as to exclude evidence of petitioner's actual intent"); Oils, Inc., B.T.A. Memo Op., Dkt. 79215 (1940) (instructions to bookkeeper to expense costs; he charged them, instead, to surplus; no expense item on return and no statement of election); Callie E. Robertson, 28 B.T.A. 635 (1933) (drilling expenses incurred by partnership in 1923; partners, however, regarded their relationship as co-adventurers and filed no timely partnership return; in 1925 return was filed expensing the cost and partners filed amended 1923 individual returns; held that these "were the only commitments made * * * respecting their choice * * * considered after adequate knowledge was had upon which they could exercise judgment"); Ravencliffs Dev. Co. v. United States, 144 F.Supp. 131 (S.D. W.Va.1956) (assertion of tangible drilling costs as ordinary loss together with listing of intangible costs as non-deductible; held to evince intent to deduct such costs and to permit expensing of intangible costs in later years).

Some of these cases disclose, too, that, despite the "clear statement" and "clear indication" language of the regulations, the courts are not concerned with mere form but look at how the costs are actually treated in the return. (The current Treas. Regs. § 1.612–4(d) contains the comment "no formal statement is necessary"). Yet, no case as yet goes so far as to say that an election need not be made out in some fashion on the return.

See, generally, 4 Mertens, Law of Federal Income Taxation, §§ 24.48 to .51 (1966).

We glean from the cases as a group (1) a general acceptance of the propriety of the regulations' requirements; (2) a firmness, as to these requirements, where the facts sensibly make out the existence of an election, even in the face of a counterbalancing claim of mistake; and (3), on the other hand, an approach sympathetic to the taxpayer whenever there is inconsistency of statement in the initial return, or whenever there is unvarying intent which is clearly and in some way physically demonstrated on the return and which is not coupled with a contrary election.

Our facts here make this issue a difficult one. Without accepting all the taxpayers' arguments, we have finally concluded that we are in disagreement with the Tax Court. We reach this conclusion because:

1. The very evidence which supports the conclusion that costs of this kind

were incurred in 1949 demonstrates, without controversy, that Mr. Goodall intended that the costs be expensed rather than capitalized. His letter to Black and the check vouchers are demonstrative and his intention is manifest.

2. There is nothing in any of the partnership returns indicative of a contrary intent. Intangible drilling costs were clearly and consistently asserted as deductions in 1950 and succeeding years and the only 1949 item, resembling that description, although unrelated, was also asserted as a deduction. Nothing of this kind was ever given a capital character on any of the returns.

3. The partnership records are equally consistent. The costs were always expensed and not capitalized.

4. There was no backtracking or reversal of decision. Concededly, the purpose of the election rule is to prevent an after-the-fact choice in the light of actual and apparent tax consequences.

5. There is an acceptable explanation for the failure of the 1949 costs to find their way into the partnership return for that year.

6. The Fourth Circuit has characterized the regulations' election language as "very clearly directory and not mandatory". Boone County Coal Corp. v. United States, supra, p. 991 of 121 F.2d. This statement worked to that taxpayer's disadvantage, for it was claiming that it had failed to comply with the strict requirements of the regulations and thus was free to make its election in an untimely amended return. We do not imply, any more than the Fourth Circuit did, that an election is not an important factor or that, once made, it is not binding. But we regard the Boone court's description of the regulations, made there to the government's advantage, as at least indicative of an approach which is reasonable and practical rather than strict and inflexible.

7. We are disinclined to have a taxpayer heavily penalized on technicalities where the kind of action which the regulations properly seek to prevent is not present or even suggested and where the result desired is an option available, as a matter of initial choice, under the statute and by the regulations. The Commissioner would make it unavailable to these taxpayers only because of what he claims is a failure to comply with technical requirements. (On our facts we are not disposed to question the validity of the regulations, as the Fifth Circuit seems to have done on the facts in F. H. E. Oil Co. v. Commissioner of Internal Revenue, 147 F.2d 1002; 149 F.2d 238; 150 F.2d 857 (5 Cir. 1945). We are quite content, for present purposes, to accept them).

8. In the same vein, we are convinced that a decision for the taxpayers on this issue would be the one which, basically, is fair and also is without prejudice to the Commissioner or to the preservation of the revenues.

9. We attach no significance to the partnership's failure to file an amended 1949 return, timely or untimely. It seems to us that this fact is as consistent with a conviction that an election to expense had been made as with an election to capitalize.

■ In view of all this, and despite the narrowness of the scope of our review, we conclude that, to the extent the Tax Court's determination was factual in nature, it was clearly erroneous in that it is not supported by substantial evidence on the record as a whole and was induced by an erroneous view of the law, Campbell County State Bank, Inc., of Herreid, S. D. v. Commissioner of Internal Revenue, supra, p. 377 of 311 F.2d, and in that we are "left with the definite and firm conviction that a mistake has been committed", Commissioner of Internal Revenue v. Duberstein, supra, p. 291 of 363 U.S., p. 1200 of 80 S.Ct.; that the partnership intended to and did elect to expense costs of this nature in 1949; and that it is not disentitled to deduct them in 1950 and subsequent years.

IX. The second individual issue. Did the Tax Court err in disallowing cer-

tain legal fees and expenses as a deduction?

This issue emerges from the partnership's 1952 return and thus affects the Goodalls' income tax for that calendar year. Legal fees and expenses in the amount of $4118.63 were incurred by the partnership in connection with claims owned and asserted by it against Automatic Equipment Manufacturing Company. The partnership deducted the fees and expenses in its computation of 1952 net income. This was disallowed in the 90-day letter "because said amount was expended for the acquisition of a capital asset" and was to be added, instead, to the cost basis of the claims. The Tax Court sustained the Commissioner.

In 1950 and 1951 the partnership purchased, at discounts from face values, 68 claims against Automatic at a time when a Chapter X reorganization was pending for it in the United States District Court for the District of Nebraska. The claims were filed with the trustees for allowance. Automatic's then sole shareholder requested a separate classification of the Goodall claims and asked that they either be denied or allowed only in the amount of their purchase price to the partnership. A full trial ensued in the district court. Chief Judge Donohoe's memorandum is reported as In re Automatic Equip. Mfg. Co., 106 F.Supp. 699 (D. Neb.1952). That memorandum discloses, pp. 705–706, that the shareholder's objection to the Goodall claims rested on a suggestion of overreaching in their acquisition. The court held that the evidence demonstrated nothing of this kind, that it could not conclude that the claims were purchased for an inadequate consideration, and p. 708, that it would not be justified "in delimiting claims owned solely and only by the Goodall partnership, since neither it nor its members ever occupied a fiduciary position in this proceeding". The claims were allowed in full and classified in the same manner as the claims of other general creditors.

The shareholder effected an appeal to this court. While the appeal was pending he made an offer to purchase the claims from the partnership. The price was agreed and the sale was made in 1953. The appeal was then dismissed on stipulation of the parties. Automatic Equip. Mfg. Corp. v. Goodall, 202 F.2d 955 (8 Cir. 1953).

The partnership, of course, reported its $44,702.96 gain on the sale of the claims as long term capital gain in its 1953 return. This gain, however, did not reflect the fees and expenses as an addition to basis. Presumably the Commissioner's 90-day letter took them into account in its decrease of net long term capital gain for the partnership for 1953.

The taxpayers assert that the fees and expenses were not incurred in defending title but in seeking collection of the claims and that ownership thereof was never in dispute.

We have encountered like issues, and have reviewed the applicable statutes, in a number of recent cases, including Iowa Southern Utilities Co. v. Commissioner of Internal Revenue, 333 F.2d 382, 385–386 (8 Cir. 1964), cert. denied 379 U.S. 946, 85 S.Ct. 438, 13 L.Ed.2d 543; Dyer v. Commissioner of Internal Revenue, 352 F.2d 948, 951–952 (8 Cir. 1965), and Industrial Aggregate Co. v. United States, 284 F.2d 639, 644–645 (8 Cir. 1960). In these opinions we outlined what we considered to be the established principles. We observed that the mere fact that title to property happens to be involved in litigation does not necessarily mean that the litigation expenses are not deductible. We also observed, however, that practicality and substance are to be recognized and that each case bears its own analysis.

It seems to us, as we read Chief Judge Donohoe's opinion, that title to the claims was very much at issue and very significant in the proceedings out of which the legal fees and expenses arose. The court characterized the contest as one "whether the creditor * * * is actually a creditor * * *, for how much, and how should his claim or interest be classified". P. 705 of 106 F.Supp. The allowance of the claims in the reor-

ganization proceeding, and the extent thereof (whether in full or whether only in their purchase price amount), were the matters litigated. The Goodalls stood to lose all, or part, or nothing. It was more than a question of mere collection of a concededly valid claim, the Goodall title to which was admitted and the collection of which would depend only on available assets. Having in mind, as we pointed out in *Iowa Southern* and *Dyer*, that there is no "ready touchstone" for these cases, that the taxpayer has the burden, and that the question is largely one of fact, we have no alternative than to affirm the Tax Court on this issue.

We add that here again the taxpayers might consider themselves well off, for we entertain doubt as to how the fees could qualify as a deduction under either § 23(a) (1) (A) or § 23(a) (2). Clearly, they were not expenses incurred in carrying on a trade or business, within the reach of the former section, and we are not convinced that they were incurred for the production or collection of income or for the conservation of property held for the production of income, within the reach of the latter section.

X. The third individual issue. Did the Tax Court err in restricting the allowable increase in the estate's basis of its interest in the partnership to only a portion of the partnership's 1953 taxable income?

This issue arises in connection with Mrs. Goodall's income tax liability for 1954/59. The basis of the property she received from the estate is important for it enters into the computation of depreciation and of capital gains and losses. One of the partnership's liquidation distributions here is governed by the 1939 Code and another by the 1954 Code.

Section 705 of the 1954 Code is specifically concerned with the basis of a partner's interest.[9] The 1939 Code contains no parallel provision. The taxpayer takes the position, however, that the same result ensues under either code. See Sen.Rept.No.1622, 83d Cong., 2d Sess., p. 91, 3 U.S.Code Cong. & Adm. News (1954) pp. 4721 and 4723.

The controversy is as to the amount of increase adjustment for partnership income for calendar 1953, the year of Mr. Goodall's death. Mrs. Goodall asserts that this adjustment upward should be in the amount of the estate's share of partnership income for the entire year and not for only a portion thereof; that this is exactly what the statute says when it refers to an increase for "the sum of his distributive share for the taxable year * * * of * * * taxable income of the partnership"; that if this involves any duplication (from the fact that income to the date of death may enter into the date-of-death-evaluation of the decedent's partnership interest and, thus, is already structured into basis for the estate and its distributees, § 113(a) (5) of the 1939 Code; § 1014 of the 1954 Code), this is a matter for the Congress to remedy and not for the courts; and that many factors other than earnings enter into any determination of value. The Commissioner's position is that the 1953 partnership income must be prorated for the entire year and that only the portion thereof allocable to the period after death serves to increase basis.

The Tax Court sustained the Commissioner, saying, in its Rule 50 order:

"Then the partnership income for the *remainder* of the year 1953 should be added to the basis of the partnership interests as of October 22, 1953. The

---

9. § 705. Determination of basis of partner's interest

(a) General rule.—The adjusted basis of a partner's interest in a partnership shall * * * be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)—

(1) increased by the sum of his distributive share for the taxable year and prior taxable years of—

(A) taxable income of the partnership as determined under section 703(a) * * * and

(2) decreased (but not below zero) by * * *

partnership income for the portion of 1953 up to October 22, 1953 has already been reflected in the partnership's fair market value as of October 22, 1953 (in increased assets or decreased liabilities, for example) and should not be taken into account a second time in computing the basis of the partnership interests subsequently to that date."

■ We agree with the Tax Court. Certainly, the decedent's share of undistributed pre-death partnership income entered into the evaluation of the decedent's partnership interest as of October 22, 1953, as the taxpayer acknowledges. That share of income is also "income in respect of a decedent", under § 126(a) of the 1939 Code. See Treas. Regs. § 1.706–1(c) (3), example 1. The estate is also entitled to a deduction under § 126(c) with respect to estate tax paid thereon. That deduction was taken. This is consistent with a line of demarcation between pre-death and post-death partnership income.

■ We are particularly impressed, furthermore, with the fact that the taxpayer's position here, as she concedes, would effect a duplication of basis benefit, namely, the use of pre-death partnership income as an increase factor in unadjusted basis and the use of the same pre-death income as an addition in the adjustment of basis. While the former has an adverse estate tax consequence, we are concerned here only with income tax basis. We cannot believe that the Congress, by the language of § 705(a) (1) (A) of the 1954 Code, meant to acknowledge and accept such a double benefit or that the law prior to the 1954 Code was to that effect. We therefore read § 705(a) (1) (A) and its reference to a partner's "distributive share for the taxable year * * * of * * * taxable

income of the partnership", when applied to a deceased partner's estate, as relating only to that portion of the partnership income which is subsequent to the date of death. This appears to us to be the only sensible meaning which can be attributed to the statutory language in this factual context. It is the meaning accepted by the regulations in the example cited and we are not inclined to hold the regulations invalid as inconsistent with or violative of the statute.

■ The taxpayer makes an additional argument to the effect that this issue was newly raised on the Rule 50 proceeding and that, under the very language of Rule 50(c),[10] it was improperly considered by the Tax Court. We see no merit in this. The estate's basis of its partnership interest was very much at issue throughout the Tax Court proceedings. The goodwill controversy, supra, is a convincing example. Despite the fact that the examining revenue agent, in his computation of the estate's basis, may have taken the entire amount of 1953 income into account, we cannot hold that this adjustment, proper as it is, is not available to the Commissioner. There was no possible prejudice to the taxpayer in the preparation and presentation of her case.

XI. The fourth individual issue. Did the Tax Court err in its measure of the 5% addition to tax under § 293(a) of the 1939 Code?

This issue concerns the Goodall joint returns for 1951 and 1953. It arises because the income of the partnership for those years was renegotiated and resulted in net repayments to the government after credits under § 3806(b) of the Code. The imposition of the addition for each of the years 1950/53 is not challenged. The only contest is as to its computation for the two years.

10. Rule 50(c) Limits on argument under this rule. Any argument under this rule will be confined strictly to the consideration of the correct computation of the deficiency or overpayment resulting from the report already made, and no argument will be heard upon or consideration given to the issues or matters already disposed of by such report or of any new issues. This rule is not to be regarded as affording an opportunity for retrial or reconsideration.

The addition imposed by § 293(a) is 5% "of the total amount of the deficiency". The taxpayers contend that the deficiency is to be measured by the difference between the correct tax and the tax shown upon the return and thus would ignore any subsequently allowed renegotiation credit for tax already paid. The Commissioner contends that the deficiency is to be measured by the difference between the correct tax and the returned amount as reduced by the later § 3806(b) credit. The Tax Court sustained the Commissioner.

Section 271(a) defines "deficiency", as used in the 1939 Code's income tax chapter (which includes § 293(a)), to mean (with other adjustments not significant here) the difference by which the correct tax exceeds "the amount shown as the tax by the taxpayer upon his return" reduced by "the amount of rebates, as defined in subsection (b) (2), made". Section 271(b) (2) defines "rebate" to mean "so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed by this chapter was less than" the tax shown upon the return. The Tax Court ruled that a § 3806(b) renegotiation credit is a rebate, within the meaning of § 271(b) (2), and, hence, serves here to increase the deficiency.

The relevant authorities, with one exception, are to this effect. Morris Kurtzon, 17 T.C. 1542 (1952); Joseph T. Miller, 23 T.C. 565 (1954), aff'd Miller v. Commissioner of Internal Revenue, 231 F.2d 8 (5 Cir. 1956), where the court stated, p. 9, "We find ourselves in full agreement with these views and with the grounds stated by the Tax Court in its opinion"; Stow Mfg. Co., 14 T.C. 1440 (1950), aff'd 190 F.2d 723 (2 Cir. 1951), cert. denied 342 U.S. 904, 72 S. Ct. 295, 96 L.Ed. 677; Rev.Rul. 53–173, 1953–1 C.B. 227, 230. The Court of Claims stands to the contrary. Riegel Textile Corp. v. United States, 148 Ct.Cl. 317, a decision which the Internal Revenue Service announced it would not follow, Rev.Rul. 60–214, 1960–1 C.B. 700. See 9 Mertens, Law of Federal Income Taxation, § 49.128 (1965).

■ We are impressed with the fact that the definition of rebate in § 271(b) (2) is a broad one. It includes, if the proper ground exists, "abatement, credit, refund, or other repayment". It is difficult for us, in the face of this breadth of definition, to exclude from its reach a § 3806(b) tax credit. We therefore agree with the Tax Court.

The decisions of the Tax Court in all six cases are therefore vacated. The cases are remanded for redetermination in accord with the conclusion hereinabove reached. Specifically, and in summary:

1. In the estate tax case (our No. 18,631; Tax Court No. 72361) the $123,208.35 increase in the value of the decedent's partnership interest attributable to differences in withdrawals by the decedent and Mrs. Goodall from the corporation is to be eliminated.

2. In the corporation case (our No. 18,636; Tax Court No. 95458) undistributed section 102 net income is to be computed with the basic surtax credit including the excessive salary and unrecorded withdrawals to which Part VI B of this opinion relates.

3. In the individual cases (our Nos. 18,632/5; Tax Court Nos. 95387/8 and 3142/3–63) deductions are to be allowed for the intangible drilling and development costs, and Mrs. Goodall, for 1956, is to be allowed an interest deduction for the $109,683.70 paid by her to the District Director in that year.

4. All other computational corrections which follow upon or are required by the foregoing adjustments, shall, of course, be made.